**DAVID J. GREENE AND CO. et al.,**
**Plaintiffs,**

v.

**DUNHILL INTERNATIONAL, INC., and**
**A. G. Spalding & Bros., Inc., Defendants.**

Court of Chancery of Delaware.

New Castle.

Dec. 24, 1968.

Richard F. Corroon and Hugh L. Corroon, of Potter, Anderson & Corroon, Wilmington, and Julius Levy, of Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs.

Louis J. Finger and David T. Dana, III, of Richards, Layton & Finger, Wilmington, for defendants.

DUFFY, Chancellor:

Plaintiffs collectively own 30,685 shares of defendant A. G. Spalding & Bros., Inc., a Delaware corporation ("Spalding"); they seek an injunction prohibiting the consummation of a proposed merger between Spalding and Dunhill International, Inc., a Delaware corporation ("Dunhill"), in which the latter will be the surviving corporation. Dunhill owns 80.3% of Spalding's stock. Plaintiffs contend that the terms of the merger are grossly unfair and inequitable to Spalding's minority stockholders. This is the decision on the motion for a preliminary injunction.

## A.

Spalding is a name known to every boy who ever owned or coveted a baseball or glove. For present purposes it is sufficient to say that it is one of the nation's leading producers of athletic equipment, with 1967 sales of approximately $58,000,000. About $2,000,000 of these resulted from sales made by its toy division under the tradename "Tinkertoy."

Dunhill is a diversified operating company which manufactures and sells both automotive and infant-feeding equipment and other products equally different from both of those. It is a conglomerate and still merger-minded.

Spalding's capitalization consists of 858,170 issued and outstanding shares of common stock. That stock is traded over the counter, but the market is thin and sporadic. Since 1963 Dunhill has been the majority stockholder of Spalding. Dunhill has outstanding 8,011,997 shares of common stock and 1,744,961 shares of converti-

ble preferred. The common shares are listed and traded on the New York Stock Exchange.

In May 1968 Dunhill decided that a merger with Spalding would be beneficial to both companies. It then engaged Duff, Anderson and Clark, Inc., a company of independent investment and financial analysts registered with the Securities and Exchange Commission, to survey both companies and to suggest a ratio of exchange involving cash, debentures or stock of Dunhill which would be fair to the stockholders on both sides. The Duff firm recommended an exchange of one $2 preferred share of Dunhill, convertible into 1.6 shares of its common (with a stated redemption value of $50.00 per share and with appropriate call protection) for each share of Spalding. The Board of Directors of each company approved the merger on those terms after fixing December 31, 1970 as the date after which redemption could begin.

On October 17 the Spalding stockholders met and approved the merger. At the meeting 90,759 shares (53.5%) of the total minority (non-Dunhill) interest of 169,140 shares voted in favor, 52,740 shares (31%) voted against, and the balance were not voted.

## B.

In their attack upon the merger ratio as grossly unfair and inequitable, plaintiffs argue from many premises. They say that the majority of Spalding's directors are Dunhill officers and directors, that through them Dunhill dominates and controls Spalding, and that in exercising such control Dunhill has breached fiduciary duties which it owes to Spalding and the minority stockholders. Specifically, it is stated that Dunhill diverted from Spalding in May 1968 an opportunity to acquire a new business which had a significant relationship to Spalding's Tinkertoy division. Other alleged breaches involve payment of inadequate dividends, consequent depression of the market price of Spalding stock,

and purchase of Spalding's stock by both Dunhill and Spalding at depressed prices to the benefit of Dunhill and the detriment of Spalding's minority stockholders. Plaintiffs say that the claimed diversion of a corporate opportunity and other breaches of fiduciary duty were neither disclosed in Spalding's proxy material nor taken into account in fixing the merger ratio.

Dunhill denies all allegations of wrongdoing. As to the alleged corporate opportunity, it asserts that there was nothing to be usurped since the opportunity was presented to Dunhill and not to Spalding. It says that dividends have not been paid by Spalding since July 1966 because cash outlay had to be restricted on account of the need for working capital. It contends that purchase of Spalding stock at depressed prices was in fact beneficial to plaintiffs and all stockholders. Finally, Dunhill argues that not only was the exchange ratio recommended by the Duff firm but, in addition, two independent directors of Spalding, H. Boardman Spalding and Washington Dodge, both with substantial direct and indirect investments in the company, voted in favor of the merger and recommended it to the stockholders as fair and equitable.

### C.

Plaintiffs in seeking a preliminary injunction contend that the pleadings and affidavits show that there is a triable issue and a reasonable probability of success on their part. I turn now to the law.

When a Delaware court is called upon to determine whether a proposed merger between a parent corporation and a subsidiary which it controls (and which has minority stockholders) should be enjoined, fairness is the established criterion for judgment. That is the litmus test to which the transaction must be submitted. Thus in Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 20, 29, 89 A.2d 862 (1952); aff'd 33 Del.Ch. 293, 93 A.2d 107, 108, 38 A.L.R.2d 425 (1952), the Supreme Court said, in addressing itself to this inquiry:

> "The principal question presented is whether the terms of a proposed merger of Mayflower Hotel Corporation * * into its parent corporation, Hilton Hotels Corporation * * * are fair to the minority stockholders of Mayflower."

The approach to be taken in resolving this question was formulated by the Court in the following way:

> "Plaintiffs' principal contention here, as in the court below, is that the terms of the merger are unfair to Mayflower's minority stockholders. Plaintiffs invoke the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property. Since they stand on both sides of the transaction, they bear the burden of establishing its entire fairness, and it must pass the test of careful scrutiny by the courts. Keenan v. Eshleman, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227; Gottlieb v. Heyden Chemical Corp., [33 Del.Ch. 82], 90 A.2d 660."

Relying upon Cole v. National Cash Credit Association, 18 Del.Ch. 47, 156 A. 183 (Ch.1931), Dunhill argues that plaintiffs must show fraud, or something akin to it, to have the merger enjoined and, quite accurately, they point out that fraud is neither alleged nor shown in the present record. It is true that in *Cole* the Chancellor fixed fraud, or the equivalent thereof, as the test for determining whether the merger would be enjoined. But in that case the corporation proposed to merge with a third party and, significantly, the same parties or persons were not on both sides of that transaction. In the absence of divided interests, the judgment of the majority stockholders and/or the board of directors, as the case may be, is presumed made in good faith and inspired by a bona fides of purpose. But when the persons, be they stockholders or directors, who con-

trol the making of a transaction and the fixing of its terms, are on both sides, then the presumption and deference to sound business judgment are no longer present. Intrinsic fairness, tested by all relevant standards, is then the criterion.

In my judgment this is unquestionably the substance of our decisions and the spirit of the equitable principles on which they are based. Compare, for example, Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660 (1952); Keenan v. Eshleman, 23 Del.Ch. 234, 2 A.2d 904 (1938); Lofland v. Cahall, 13 Del.Ch. 384, 118 A. 1 (1922); and 3 Fletcher Cyclopedia Corporations (Perm.) § 921. See also Brundage v. The New Jersey Zinc Co., 48 N.J. 450, 226 A.2d 585 (1967); and Abelow v. Midstates Oil Corporation, 41 Del.Ch. 145, 189 A.2d 675 (1963).

Defendants rely upon Bruce v. E. L. Bruce Company, 40 Del.Ch. 80, 174 A.2d 29 (1961). It appears from the opinion that plaintiffs there were relying entirely upon a showing of fraud and, after reviewing the record made at the preliminary stage, the Court said they had not made out "a case for injunctive relief against a merger on the grounds of fraud." Intrinsic unfairness of the proposal was not alleged nor was the Court called upon to discuss Sterling. As to Porges v. Vadsco Sales Corporation, 27 Del.Ch. 127, 32 A.2d 148 (1943), I need only say that to the extent this Court applied any principle inconsistent with those later stated by the Supreme Court in Sterling, I am bound by and I follow the latter.

■ Since Dunhill stands upon both sides of the proposed merger, it (a) has the burden of proof, (b) to show that the transaction is fair, (c) after a careful scrutiny by the Court.

■ In focusing on what is meant by fair under these circumstances, Dunhill argues that the Court need only find that the plan is one that "disinterested men would find reasonable" and that it "has been worked out on the basis of an honest report submitted by competent disinterested appraisers on a sound valuation basis." If this means that the Court should not examine the Duff report and consider it (and its contents) along with all other affidavits in the record, then the argument is not sound. What is to be considered was stated precisely by Chancellor Seitz in Sterling:

"I conclude that all relevant value figures of both corporations may be examined and compared in order to arrive at a decision as to the fairness of the plan. Thus, while not determinative, nevertheless, the value of each corporation for various purposes, e. g., going concern value, book value, net asset value, market value, is pertinent to the issue presented." (89 A.2d at p. 867)

He then analyzed the report made by the independent specialist, and the affidavits, and the testimony. Compare Porges, in which the Court said, in language approved by the Supreme Court in Sterling:

"'To arrive at a judgment of the fairness of the merger, all of its terms must be considered.' 27 Del.Ch. 134, 32 A.2d 151." (93 A.2d at p. 114)

■ Dunhill argues that the Duff, Anderson report is, under 8 Del.C. § 141(e), entitled to a presumption in its favor. That statute "protects" directors relying in good faith upon certain reports made to the corporation, but it has no application here. Nor does it in any way weaken the requirements fixed by Sterling.

### D.

Before reviewing the economic data and the related arguments, I want to note that experts from nationally-known independent firms submitted affidavits in support of each side: Harold Benjamin, a Vice-President of Arnold Bernhard & Co., Inc., which is the manager of the Value Line group of mutual funds and related compa-

nies, for plaintiffs; Raymond C. L. Greer, Jr., Executive Vice-President of Duff, Anderson & Clark, Inc., and Daniel W. Lufkin, Chairman of the Board of Donaldson, Lufkin & Jenrette, Inc., both for defendants. Other affidavits were filed by each side relating to the fairness or absence thereof in the proposed ratio. The Court's function is not to choose one expert over another or to reach a conclusion as to the competence or judgment of any of the independent persons or firms who have taken a position on the merger. The Court's duty is to determine, on the present record, whether the merger is legally fair under the tests I have stated.

The Duff, Anderson report is the heart of Dunhill's position and of that report Mr. Greer states:

"* * * we conclude that consummation of the proposed merger through issuance by Dunhill of a $2.00 preferred convertible into 1.6 shares of Dunhill common (with a stated redemption value of $50 per share and with appropriate call protection) for the 169,140 shares of Spalding not owned by Dunhill on a share-for-share basis is fair and equitable to the minority shareholders of Spalding and to the shareholders of Dunhill."

Mr. Lufkin supports that conclusion; he states that the 1 for 1.6 ratio is "fair and equitable to all of the shareholders of both companies." Mr. Benjamin has a contrary view; to him "the proposed merger is grossly unfair to the minority shareholders of Spalding."

First, I note that the call protection of the proposed preferred extends only to December 31, 1970; the $2 dividend is substantially higher than the 80¢ presently paid on 1.6 shares of Dunhill common. Hence, should the merger be consummated, there would be good reason for Dunhill to redeem the new preferred at $50 per share and so eliminate the $2 dividend. Since the higher yield on the proposed preferred vis-a-vis the Dunhill common is assured

for a relatively short time only, it is reasonable to conclude that one share will be substantially equal in value to the 1.6 shares of Dunhill common.

■ Dunhill argues that the Court should give great weight to approval of the merger terms by H. Boardman Spalding and Washington Dodge, each of whom holds substantial amounts of Spalding stock; both are Spalding directors without any other connection to Dunhill. These facts are entitled to weight, of course, but they are not conclusive nor do they in any way modify the *Sterling* rule or this Court's duty in applying it.

■ Next, Dunhill argues that approval by a majority of so-called "disinterested" stockholders creates a presumption of fairness, thus shifting to plaintiffs the burden of showing unfairness. But such approval does not shift the burden of proof. See the unreported opinion by Chancellor Seitz in Stryker & Brown v. The Bon Ami Company et al., C.A.1945 (3/16/64). And compare Sterling v. Mayflower Hotel Corp., supra.

I turn now to the affidavits and the components of value. The experts differ as to what are significant factors and the inferences to be drawn from them. But all agree that with limited trading activity the current market for Spalding common is not a fair measure of value. And as to differences in approach taken and weight assigned by the experts, I regard two elements as particularly pertinent for present purposes: the amount of the earnings base and the multiplier to be applied to it.

First, as to earnings, Duff, Anderson uses $3.00 per share as the estimate of present annual "earning power." Plaintiffs' expert argues that this should be increased by some 40¢ a share as a partial allowance against losses Spalding has regularly sustained in its United Kingdom operations (and which may not be set off against domestic income for Federal income tax purposes) because management's an-

nounced policy is to eliminate those losses. For that reason, Mr. Benjamin says, the earnings base should be enlarged by 40¢ per share.

 It is settled law in Delaware that earnings value is to be determined on the basis of past and not on prospective earnings. Application of Delaware Racing Association, Del.Ch., 213 A.2d 203 (Sup. Ct.1965). In this kind of proceeding the purpose, of course, is to attempt to arrive at a meaningful projection of earnings and, in a given case, specific factors may make the use of unadjusted past earnings an unsatisfactory basis for capitalization. Stryker & Brown v. The Bon Ami Company, et al., supra. In short, we are not obliged to blindly use past earnings without reference to other factors of record. Here, however, plaintiffs' argument is based entirely upon the most general of management objectives (understandable though they are) and without reference to the cost of eliminating the losses. The short of it is that I think the Court should take earnings as they are, and not as the parties would like them to be. So, telling it as it is, $3.00 is the earnings factor.

Next I consider the "multiplier" issue; choosing that factor is among the most difficult of all technical issues. Compare Felder v. Anderson, Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278 (1960). In its approach Duff, Anderson developed a number of quantitative comparisons of Spalding with a group of twelve other companies "generally engaged in the broad athletic and recreational equipment markets." In that group the Duff firm found Spalding low in sales growth and in growth in earnings per share on a reported basis; it noted that, comparatively, Spalding has had an erratic earnings record. And it was low in return on invested capital. Since Spalding's performance fell below average in the thirteen-company group, Duff, Anderson arrived at a below average multiplier. The median ratio of the thirteen companies was 17.8, with a range as high as 41.7 (for Head Ski Co.).

Duff, Anderson capitalized Spalding's $3.00 earnings at about 15–16 times and arrived at a value of $45–50 per share.

The twelve companies used by the Duff firm for comparative purposes include Acushnet Company, Adirondack Industries, Inc., and Wilson Sporting Goods Company, all of which compete pretty much across the board with Spalding. Four others are in the athletic equipment market and three of them compete with Spalding "to a limited degree." The remaining five "participate in the broad recreational and leisure time field." This latter grouping consists of companies which manufacture bicycles, boats, firearms and playing cards. Thus, Outboard Marine Corporation, one of the five, is the largest domestic manufacturer of outboard motors; it also produces power lawn mowers and golf carts. Starcraft Corporation makes aluminum and fiberglass boats, camper trailers and farm equipment. Murray Ohio Manufacturing Company produces bicycles, scooters and baby walkers. Browning Arms Co. distributes firearms made to its specifications. United States Playing Card Company manufactures cards and miscellaneous card games.

 The record creates a reasonable doubt about the fairness of subjecting the Spalding stock for valuation purposes to comparison with a cross-section of companies that includes such a product mix. The Duff, Anderson report does not show why these five companies with their respective product lines provide a more reasonable experience for comparative purpose than others in the "broad recreational and leisure time field"—those in the field of photography and other hobby arts, for example. And the record does not show what the result would be if the five companies to which I have referred were eliminated from the comparative studies.

Plaintiffs argue, and Dunhill tacitly concedes, that among all the companies considered Wilson Sporting Goods Company is most similar to and competitive with Spalding. In October 1968 its stock sold

at 23.5 times earnings. And Mr. Benjamin's affidavit shows that, measured by average earnings with 1962/1964 as a base, Spalding's earning trend is at least as good as Wilson's. It also shows that, after adjustments, Spalding's growth in sales, earnings and profit margins compare very favorably or are superior in certain respects to those of Wilson and Spalding's other competitors. And the median price earnings ratio for the five sporting goods companies only was 23.4. These facts are, of course, not controlling, but they do point up the special significance of the choice of comparisons in this case.

Without a market price for reference the selection of an appropriate multiplier takes on added import as a key factor in determining value. The Court's duty, as Dunhill argues, is not to select the proper multiplier. But, given Dunhill's burden here, I conclude that it has not made such a record as to satisfy me that I can now say that it is right as matter of fact and law at this point in the case. Specifically, after careful scrutiny I cannot say that the five companies should fairly be included in the facts fixing an appropriate multiplier. Dunhill will have full opportunity at final hearing to show that they should be.

### E.

I next consider plaintiffs' contentions that Dunhill took over a corporate opportunity which rightfully belonged to Spalding. The law as to corporate opportunity is settled in Delaware by Supreme Court decisions. The cornerstone case is Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503 (1939), which was reaffirmed in Johnston v. Greene, 35 Del.Ch. 479, 121 A.2d 919 (1956), and more recently in Equity Corporation v. Milton, Del.Ch., 221 A.2d 494 (1966). In the latter case Chief Justice Daniel Wolcott wrote:

"The rule of the *Guth* case is that when there is presented to a corporate officer a business opportunity which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, or is an opportunity in which the corporation has an actual or expectant interest, the officer is prohibited from permitting his self-interest to be brought into conflict with the corporation's interest and may not take the opportunity for himself."

■ While our law on corporate opportunity has developed around the duty owed by directors and officers, I am of the view that comparable duties and standards should be imposed when the party whose conduct is in question is a stockholder. In some circumstances a stockholder has opportunities to express and prefer his self-interest to that of the corporation. But we are concerned with circumstances in which a stockholder, by virtue of his control of corporate functions, makes a choice advantageous to himself and against the corporate interest. As to this, the principle stated by Chancellor Josiah Wolcott in Allied Chemical & Dye Corporation v. Steel & Tube Co., 14 Del.Ch. 1, 120 A. 486 (1923) is applicable; he wrote:

"When, in the conduct of the corporate business, a majority of the voting power in the corporation join hands in imposing its policy upon all, it is beyond all reason and contrary, it seems to me, to the plainest dictates of what is just and right, to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the directors in their relation to all the stockholders. Ordinarily the directors speak for and determine the policy of the corporation. When the majority of stockholders do this, they are, for the moment, the corporation. Unless the majority in such case are to be regarded as owing a duty to the minority such as is owed by the directors to all, then the minority are in a situation that exposes

them to the grossest frauds and subjects them to most outrageous wrongs."

See, also, Epstein v. Celotex Corporation, Del.Ch., 238 A.2d 843 (1968). And compare Chancellor Seitz's comment about the duty of majority stockholders in Bennett v. Breuil Petroleum Corp., 34 Del.Ch. 6, 99 A.2d 236 (1953):

> "As a starting point it must be conceded that action by majority stockholders having as its primary purpose the 'freezing out' of a minority interest is actionable without regard to the fairness of the price [citation omitted]."

On the same point, see Condec Corporation v. Lunkenheimer Company, Del.Ch. 230 A. 2d 769 (1967).

■ The rule of *Guth* is applicable in determining whether a majority stockholder, acting as a result of his control of a corporate function, has preempted an opportunity which rightfully belongs to the corporation. Perlman v. Feldman, 219 F. 2d 173 (2 Cir.1955), 3 Fletcher Cyclopedia Corporations, § 861.1.

Child Guidance Toys, Inc., was acquired by Dunhill on May 31, 1968; it manufactures and distributes educational toys and visual aid teaching devices. In 1967 Child Guidance had net sales of about $8,000,000. Prior to the acquisition Spalding had a toy division, which made and sold "Tinkertoys," Dunhill did not make or sell toys of any kind.

■ Plaintiffs allege that Dunhill diverted to itself the opportunity to acquire Child Guidance and that this was done in violation of its fiduciary duty to the public stockholders. Dunhill argues that this issue is not relevant to the fairness of the merger terms but I cannot say, on this record, that as a matter of law it is not. Duff, Anderson's valuation is based on the inclusion of Child Guidance as part of Dunhill and not of Spalding. And Mr. Benjamin's uncontested affidavit states that if Child Guidance belongs to Spalding "this would confer a significant advantage and an additional element of value for Spalding." It follows that the contention is relevant to valuation.

Next, Dunhill argues that plaintiffs have not sustained their burden of proof to show that there has been an unlawful diversion. The record on this issue is limited, but such as it is, I believe, favors plaintiffs. Thus the affidavit filed by Morris Shilensky, whose firm is counsel to Dunhill, shows that shortly after a prior merger by that company "there was widely circulated a description of a program for acquisition of businesses for Dunhill as well as for Spalding." He states that the Child Guidance opportunity came to Dunhill and not Spalding. That is perfectly understandable. The program Dunhill publicized *included* Spalding but asked that proposals be submitted to *Dunhill*. A reasonable inference from all of this is that Dunhill had taken over any acquisition program Spalding had. And in the same literature the Platt & Munk division of Dunhill, to which Child Guidance was later assigned, is identified as a "book publishing company;" it was said that it had areas of interest in "book publishing concerns * * * games, greeting cards and book clubs." Not a word about toys. And the Tinkertoy operation of Spalding is identified as the division interested in educational toys and equipment. Finally, the acquisition was apparently made for cash and there is no dispute about Spalding's ability to secure the amount actually paid.

■ In sum, the record makes out a sufficient showing of a business opportunity in the line of Spalding's business, which would have been of practical advantage to it and which it was financially able to undertake; that opportunity was acquired by Spalding's controlling stockholder.

**436**

### F.

Equating one share of Spalding stock to 1.6 shares of Dunhill common and computing "pro forma" net earnings on that basis, it appears that Spalding earnings on a per share basis would be sharply reduced after merger: from $2.69 to $1.74 for 1967 and from $2.12 to $1.07 for the first half of 1968. On a similar basis, book value of a Spalding share would be reduced from $34.08 to $17.49. It is obvious that Duff, Anderson regards such factors as a call on a common stock with an active New York Stock Exchange listing, an equity position in a larger industrial based company, and other factors discussed in its report as more than offsetting the "near term paper dilution" which it tacitly concedes will be the lot of the Spalding minority. And so they may. But, cumulatively, the uncertainty as to the appropriate multiplier, the record facts as to the Child Guidance opportunity and the substantial dilution in earnings and book value which will admittedly occur, persuade me that plaintiffs have made out the probability of success sufficient for their motion. In other words, on the present record Dunhill has not met its burden of proof to show that the transaction is fair after careful scrutiny by the Court. Sterling v. Mayflower Hotel Corp., supra. I hasten to add that this is not a finding that the merger is unfair. It simply means that plaintiffs have established their right to go to trial and so the motion for a preliminary injunction will be granted. At trial each side will have full opportunity to develop the contentions made in the present record. In view of the fact that consummation of the merger will be enjoined, Dunhill is entitled to and on request will get a prompt trial on the merits.

Other contentions of the parties have been considered although not specifically referred to herein.

Order on notice.