**FRANCIS I. duPONT & CO. et al.,
Plaintiffs,**

v.

**UNIVERSAL CITY STUDIOS, INC., a Delaware corporation, Defendant.**

Court of Chancery of Delaware.

Sept. 27, 1973.

**346**

Richard F. Corroon of Potter Anderson & Corroon, Wilmington, and Walter G. McNeill of Brown, Wood, Fuller, Caldwell & Ivey, New York City, for plaintiffs.

E. N. Carpenter, II, and R. Franklin Balotti of Richards, Layton & Finger, Wilmington, and Cyrus R. Vance of Simpson Thacher & Bartlett, New York City, for defendant.

DUFFY, Justice:[1]

This is the decision upon exceptions to an Appraiser's final report determining the value of minority shares in a corporation absorbed in a short form merger.[2]

## A.

On March 25, 1966 Universal Pictures Co. (Universal) was merged into Universal City Studios, Inc. (defendant) under 8 Del.C. § 253 effected by MCA, Inc., the common parent. MCA owned 92% of Universal and 100% of defendant. The minority stockholders of Universal were offered $75 per share which plainitffs re-jected and then perfected their appraisal rights.

On March 29, 1973 the Appraiser filed a final report, in which he found the value of the Universal stock to be $91.47 per share. Both parties filed exceptions and this is the decision thereon after briefing and oral argument.

## B.

The parties' ultimate disagreement is, of course, over the value of the stock. Plaintiffs submit that the true value is $131.89 per share, defendant says it is $52.36. The computations are as follows:

*Plaintiffs*

| Value Factor | Value | Weight | Result |
|---|---|---|---|
| Earnings | $129.12 | 70% | $ 90.38 |
| Market | 144.36 | 20% | 28.87 |
| Assets | 126.46 | 10% | 12.64 |
| | | Value per share | $131.89 |

*Defendant*

| Value Factor | Value | Weight | Result |
|---|---|---|---|
| Earnings | $ 51.93 | 70% | $ 36.35 |
| Dividends | 41.66 | 20% | 8.33 |
| Assets | 76.77 | 10% | 7.68 |
| | | Value per share | $ 52.36 |

*Appraiser*

| Value Factor | Value | Weight | Result |
|---|---|---|---|
| Earnings | $ 92.89 | 80% | $ 74.31 |
| Assets | 85.82 | 20% | 17.16 |
| | | Value per share | $ 91.47 |

The parties differ as to details of the report to which each assigns error, but their

---

1. Sitting by assignment of the Chief Justice pursuant to the provisions of Art. 4, § 13, Del.C.Ann. of the Constitution.

2. 8 Del.C. § 253 permits "short mergers" involving a parent corporation and one or more subsidiaries which are at least 90% owned; appraisal rights are provided as follows:
"(e) In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under this section is not owned by the parent corporation immediately prior to the merger, the surviving corporation shall, within 10 days after the effective date of the merger, notify each stockholder of such Delaware corporation that the merger has become effective . . . . Any such stockholder may, within 20 days after the date of mailing of the notice, de-mand in writing from the surviving corporation payment of the value of his stock exclusive of any element of value arising from the expectation or accomplishment of the merger. If during a period of 30 days after such period of 20 days the surviving corporation and any such objecting stockholder fail to agree as to the value of such stock, any such stockholder or the corporation may file a petition in the Court of Chancery as provided in subsection (c) of section 262 of this title and thereupon the parties shall have the rights and duties and follow the procedure set forth in subsections (d) to (j) inclusive of section 262."
8 Del.C. § 262 states the specific procedures to be followed in perfecting appraisal rights and in conducting the appraisal.

exceptions spring from fundamentally different views of several basic elements of the appraisal.[3] These are, principally: (1) Universal's earnings and selection of the proper multiplier for capitalization of those earnings; (2) the correct asset value per share; (3) whether an independent dividend value should have been used; (4) whether a market value for Universal's stock should have been reconstructed; and (5) the correct weight to be given each of the value factors found to be relevant by the Appraiser.

## C.

At the heart of the dispute is the different picture each side draws of the nature of Universal's business, its place in the broader industry of which that business was a part, and the prospects of the industry generally and of Universal in particular. The parties, apparently, agree that at the date of merger Universal was engaged in the production and distribution of feature motion pictures. But agreement ends there.

Defendant takes exception to the Appraiser's failure to find that in the years prior to merger the industry was declining and that Universal was ranked near its bottom. And it argues that Universal was in the business of producing and distributing feature motion pictures for theatrical exhibition. It contends that such business, generally, was in a severe decline at the time of merger and that Universal, in particular, was in a vulnerable position because it had failed to diversify, its feature films were of low commercial quality and, unlike other motion picture companies, substantially all of its film library had already been committed to distributors for television exhibition. In short, defendant pictures Universal as a weak ("wasting asset") corporation in a sick industry with poor prospects for revival.

The stockholders see a different company. They say that Universal's business was indeed the production and distribution of feature films, but not merely for theatrical exhibition. They argue that there was a dramatic increase in the television market for such feature films at the time of the merger. This new market, they contend, gave great new value to a fully amortized film library and significantly enhanced the value of Universal's current and future productions. They equate the television market to the "acquisition of a new and highly profitable business whose earnings potential was just beginning to be realized at the time of the merger." Finally, say plaintiffs, the theatrical market itself was recovering in 1966. Thus, they paint the portrait of a well situated corporation in a rejuvenated industry.

The Appraiser agreed with the stockholders that the theatrical market was recovering and that the new television market had favorable effects and would continue to provide a ready market for future films to be released by Universal. However, he declined to give the stockholders the benefit of all inferences as to specific value factors which they maintained those conclusions required.

## D.

I first consider earnings. Both parties disagree, for different reasons, with the result of the Appraiser's analysis of Universal's earnings as a value factor. He concluded that Universal's earnings value should be derived by calculating the mean average of earnings per share for the years

---

3. In Tri-Continental Corporation v. Battye, Del.Supr., 31 Del.Ch. 523, 74 A.2d 71 (1950), the Supreme Court formulated the concept of value to be determined in an appraisal: it is a "proportionate interest in a going concern . . . the true or intrinsic value of . . . stock which has been taken by the merger." It directed that "all factors and elements which reasonably might enter into the fixing of value" must be considered in an appraisal, including "market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation . . . . ."

1961 through 1965, the five years preceding the merger.[4] So doing, he arrived at average earnings of $5.77 per share. He then adopted a multiplier of 16.1, which is the average price earnings ratio of nine motion picture companies,[5] to capitalize Universal's earnings.

The stockholders accept the multiplier selected by the Appraiser but argue that he should have used the 1965 earnings of $8.02 per share rather than the mean average of the five years preceding the merger.

Valuation of a going business is a complex task and nothing about it is more difficult than capitalizing earnings.[6] Expert authorities disagree about the relative significance of past, present and projected earnings and as to whether some figure representative of the enterprise's true earning power can be fairly derived from such figures. But our law has settled upon a basic approach to be followed in appraisal proceedings.

■ It is established Delaware law that for appraisal purposes earnings are to be determined by averaging the corporation's earnings over a reasonable period of time. In re Olivetti Underwood Corp., Del.Ch., 246 A.2d 800 (1968); Sporborg v. City Specialty Stores, 35 Del.Ch. 560, 123 A.2d 121 (1956). The determination must be based upon historical earnings rather than on the basis of prospective earnings. Application of Delaware Racing Association, Del.Supr., 213 A.2d 203 (1965).[7] The five-year period immediately preceding the merger is ordinarily considered to be the most representative and reasonable period

of time over which to compute the average. Application of Delaware Racing Association, supra; In re Olivetti Underwood Corporation, supra.

■ Our cases have recognized that an appraiser, in certain circumstances, may justify adjusting average earnings by eliminating "unusual and isolated" items from reported earnings or, in a "most unusual situation" by limiting or expanding the number of years over which the average is taken. Adams v. R. C. Williams & Company, 39 Del.Ch. 61, 158 A.2d 797 (1960). But I agree with the Appraiser's finding that no such situation has been shown here.

The stockholders argue that averaging past earnings is proper only when the earnings history has been erratic. In support of that proposition, Mr. Stanley Nabi, managing partner of a NYSE brokerage house and an investment and financial analyst, testified that the accepted practice among security analysts is to capitalize present earnings, and to give the trend of earnings important consideration in the selection of the multiplier. The stockholders argue that Universal's earnings history was not erratic but, in fact, had a steady and rapid growth. They contend that the Appraiser therefore should have used the current (1965) earnings as the figure to be capitalized.

This argument is not persuasive even if Mr. Nabi's testimony as to the accepted practice among security analysts for capitalizing earnings is conceded to be correct. Whatever that practice may currently be,

---

4. Those earnings per share were:

|      |        |
|------|--------|
| 1961 | $3.32  |
| 1962 | 4.96   |
| 1963 | 6.22   |
| 1964 | 6.32   |
| 1965 | 8.02   |

5. Those companies were Columbia, MGM, Paramount, Republic, 20th Century Fox, United Artists, M.C.A., Walt Disney and Warner Brothers.

6. One authority describes the practical application of the idea of capitalization as "more than difficult; it is a kind of sophisticated guesswork." 1A. Dewing, The Financial Policy of Corporations, 287, n. "1" (5th ed. 1953).

7. Compare Cottrell v. Pawcatuck Company, Del.Supr., 36 Del.Ch. 169, 128 A.2d 225 (1956), a sale of assets case where the Court noted that the proposed projection took no account of possible future management difficulties which could affect earnings.

the policy of Delaware law is that averaging earnings over the five years immediately preceding the merger should be the rule and not the exception. In short, a choice among alternative techniques for capitalizing earnings has been made and no persuasive conceptual reason has been shown to change that choice now.

The stockholders also argue that Universal's earlier earnings, particularly those of 1961, were not representative of Universal's earning power at the time of merger because television was a relatively minor factor in such earnings. They offered a number of alternatives to the Appraiser and, on the exceptions, press their contention that he should have used 1965 earnings of $8.02 per share.

■ I do not agree with the shareholders that the "pre-1965 earnings had become an anachronism" at the time of merger. I view Universal's situation at that time as one of change in the nature of its market, not in the fundamental nature of its business. It was undoubtedly clear at the time of merger that the new television market had contributed substantially to Universal's earnings and would continue to do so for at least the short term. It was also evident that television presented a relatively permanent new market. But I do not think it realistic to say that that market was of such a revolutionary character as to assure for time without end either a trend of increasing earnings or a comparatively high level of earnings. Compare Adams v. R. C. Williams & Company, supra. The fact is that, with or without the television market, Universal's earning experience over the long term remains subject to the variables in its managerial and artistic talent, the ability and ingenuity of competitors and the uncertainties of public tastes in entertainment.

■ Certainly the figures show, as plaintiffs argue, that the trend in earnings was on the rise from 1961 through 1965 but that is not a reason in law for abandoning the averaging approach required under *Delaware Racing* and other Supreme Court decisions, nor does it provide a basis for eliminating any one year as unusual or isolated under *Adams*. The trend has significance in the choice of the multiplier.

■ Universal's earnings over the five-year period were representative of the Company's experience in the broader context of its business of producing feature length films, whether for the theatrical market or for television, or both. An important purpose behind the practice of averaging over a five-year period is to balance extraordinary profits and/or losses which might distort the earnings data if a period of only one or two years was used. Adams v. R. C. Williams & Company, supra. It is for this reason that the use of such shorter periods by appraisers has generally not been permitted. See Sporborg v. City Specialty Stores, supra (one year); Adams v. R. C. Williams & Company, supra (two years). Similarly, an appraiser usually may not exclude years of unusual loss or profit, nor may he extend the period to be averaged so as to minimize their impact. Cf. Felder v. Anderson, Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278 (1960). None of the five years immediately preceding the merger has been shown to be so extraordinary as to justify exclusion from the span to be averaged. As I have indicated, the very purpose of averaging is to balance out such years as 1961 when the Company's earnings were comparatively low.

■ I conclude, therefore, that the Appraiser correctly used the mean average of earnings for the five years immediately preceding the merger.

Defendant agrees that the earnings to be capitalized is the five-year average of $5.77 per share, but says that the Appraiser erred in adopting as a multiplier the industry price earnings ratio (16:1). It argues that even if such ratio were appropriate, the correct figure is not more than 12.7

and it contends that the maximum multiplier permitted under our case law is 10, except under special circumstances not present here. Plaintiffs do not except to the Appraiser's multiplier. Specifically, defendant says a multiplier of 9 is fair both in terms of Universal's prior history and its position in that industry.

Admittedly many of the cases and treatises approve a multiplier of 10 or thereabouts. But that is based largely on the economics and pricing structure of an earlier day and, under the circumstances here present, the use of any such number would be artificial.

Arguably, there is much to be said about the choice of any particular multiplier and the briefs cover it all. In the last analysis, I am not persuaded that the Court should reject the Appraiser's reasonable judgment in this matter. In accepting his choice, I note particularly the trend of Universal's earnings, the predictability of certain of its television income during the four years following merger (which I regard as an earning prospect to be considered under *Tri-Continental Corporation*), that valuation on a going concern basis as of a single date (of the merger) is the object of the appraisal, and the norm, therefore, is to determine the multiplier as of that date; determination of the multiplier by reference to the average experience of other companies in comparable businesses is a reasonable formulation in this case.

The earnings value (16.1 x $5.77 = $92.89) determined by the Appraiser will be approved.

### E.

I turn now to asset value. Plaintiffs say that at the time of merger the net figure was $126.46, defendant says it was $76.77, the Appraiser determined it to be $85.82.

The parties have argued at some length their respective views of the adjustments which should be made to Universal's book value, but I do not propose to discuss each of these in detail. My view of the issues is reflected in the table and the comments which follow.

|  | Plaintiffs | Defendant | Appraiser | Court |
|---|---|---|---|---|
| (1) Book value | $ 58.42 | $ 57.94 | $ 57.94 | $ 58.42 |
| (2) Increase in value of MCA stock | 7.28 | 7.28 | 7.28 | 7.28 |
| (3) Estimated future television revenue | 22.84 | 20.26 | 20.26 | 22.84 |
| (4) Future theatrical revenue from fully amortized pictures | 32.17 | 0 | 0 | 0 |
| (5) 30% network distribution fee (if disallowed; if 12½% allowed, $2.84) | 5.40 | 0 | 0 | 2.84 |
| (6) Present value discount on accounts payable after one year. | .34 | .34 | .34 | .34 |
|  | $126.45 | $ 85.82 | $ 85.82 | $ 91.72 |

■ (1) *Book value*: The figures for book value differ, depending on whether an annual television payment from NBC, due in July 1966, is accrued. The Appraiser agreed with defendant's argument that it should not be because Universal was on a cash basis. But the record shows that its practice was to accrue (television) payments equally over the year. Under the circumstances I think it fair to apply that practice on the date of merger to the payment due from NBC.

(3) *Estimated future television revenue*: Both parties agree that some discount should be applied in reducing future revenue to present value. They differ over the rates to be used and the Appraiser accepted the approach argued by the Corporation. I recognize that for accounting purposes a distinction between estimates of income generally and income from specified contracts is probably logical. But I am impressed by the analogy to Federal regulations (and decisions) which permit a dis-

count of less than even 5% from such estimates.

■ (4) *Future theatrical revenue from fully amortized pictures*: Plaintiffs argue that the Appraiser was mistaken in his conclusion that Poole v. N. V. Deli Maatschappij, Del.Supr., 243 A.2d 67 (1968), holds that asset value cannot be calculated on the basis of earnings. They argue that 1965 income from the films in question should be capitalized (with appropriate discounts) and an asset value determined. But I conclude that the Appraiser was correct, because in *Poole* the Court said that

"Any allowance for earning power of the assets . . . is best left to the court's consideration of earnings as an independent element of stock value and to the court's exercise of the weighting function."

It follows that capitalization of the earning power of the films may not be used to independently determine their asset value.

Plaintiffs argue that their position is supported by Walt Disney Productions v. United States, 9 Cir., 480 F.2d 66 (1973), affirming 327 F.Supp. 189 (1971), which holds, in a tax-refund case construing the "investment credit" provisions of the Internal Revenue Code, that certain Disney pictures each had a useful life of eight years. But that is a ruling of law which the Court cannot apply to the facts of this case. As I read *Poole,* the standard to be applied is fair market value of the pictures on the date of merger and that cannot be determined as a function of earning power, nor may it be determined, factually, by reference to what was decided about different pictures in another case. It is a matter of proof here and, as I understand the evidence, the only proof of value was that, on the date of merger the film library had a market value amounting to some 65¢ per share. If this value is not included in the book value (of $58.42) stated above, it should be and the rulings herein will be modified accordingly.

■ (4) *30% network distribution fee*: Plaintiffs argue that the fee of 30% for network distribution services which Universal paid to MCA in connection with the leasing of films to NBC is unreasonable. The Appraiser agreed with defendant's argument that plaintiffs did not meet their burden of proving that the amount was not reasonable. But I have a different view of the issue. So far as this fee is concerned MCA had a fiduciary duty to Universal and, therefore, it has the burden of demonstrating that the fee was fair. Levien v. Sinclair Oil Corp., Del.Ch., 261 A.2d 911 (1969); aff'd in part and rev'd in part sub nom. Sinclair Oil Corp. v. Levien, Del.Supr., 280 A.2d 717 (1971); David J. Greene & Co. v. Dunhill International, Inc., Del.Ch., 249 A.2d 427 (1968). See also Sterling v. Mayflower Hotel Corp., Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952); Keenan v. Eshleman, Del.Supr., 23 Del.Ch. 234, 2 A.2d 904 (1938). As to plaintiffs' failure to take an exception on this issue, I regard this as a formality which can be cured by amendment. Defendant has had full opportunity to brief and argue the issue so it has not been prejudiced.

I agree with the Appraiser's conclusion that a fee in some amount is payable but, given the state of the record and defendant's burden, I find that it should be reduced to 12½%, the rate fixed in the prior agreement which was amended only eight months before the contract in question was made. And I note the evidence as to other motion pictures which dealt directly with the networks and the 10% fee paid by another company.

Defendant argues that the Appraiser should have recognized three kinds of liabilities in arriving at his valuation: (1) estimated losses ($1.72 per share) on theatrical distribution of films on release as of March 25, 1966; (2) the costs ($4.21 per share) of group insurance and retirement benefits; and (3) a discount ($3.12 per share) relating to a delay in realizing inventory. I conclude that the decision of the Appraiser refusing to adjust for these items should be approved for the reasons stated in his report.

■ I conclude that for appraisal purposes a share of Universal stock should be assigned an asset value of $91.72.

### F.

The Appraiser declined to include market value of Universal stock as a value factor because there was not a reliable market for it and none could be constructed. Defendant agrees with that conclusion. Plaintiffs urged the Appraiser to find a reconstructed value of $144 a share.

■ The Delaware law is that in the absence of a reliable market for stock, a reconstructed market value "must be given consideration", if one can be made. Application of Delaware Racing Association, supra.

■ I agree with plaintiffs that, on a comparative basis, Universal's financial performance was more impressive than that of MCA, but I am not persuaded that a reliable basis for valuation can be established by applying MCA price earnings ratio to Universal's 1965 earnings. Certainly there was a market for MCA shares and Universal's earnings and experience contributed to whatever value that buyers and sellers in that market placed upon MCA at any given time. But to reach through the MCA curtain and find Universal, is to grasp at shadows, and to attempt to devine (in this case where we deal with hard dollars) what buyers would have paid for Universal had they the chance, is to substitute fantasy for fact. This simply involves too much speculation about too many intangibles. Accordingly, market value will not be included as an appraisal index.

### G.

Defendant urged the Appraiser to capitalize the historical dividends of Universal and assign to them an independent value of $41.66 for appraisal purposes. He declined to do so. Plaintiffs agree.

■ I agree with the Appraiser's conclusion, based upon Felder v. Anderson, Clayton & Co., supra, that dividends largely reflect the same value as earnings and so should not be separately considered. Delaware Racing, with its policy and history of "no dividends", was obviously a unique case entirely unlike that presented here.

### H.

■ Finally, I consider the weighting factor, an issue as to which the parties are in least disagreement. The views of the Appraiser and the parties are as follows:

| Value Factor | Plaintiffs | Defendant | Appraiser |
|---|---|---|---|
| Earnings | 70% | 70% | 80% |
| Assets | 10% | 10% | 20% |
| Market Value | 20% | -- | -- |
| Dividend Distribution | -- | 20% | -- |

As this table shows, the parties agree on the weight which should be assigned to earnings and assets, respectively. They differ on allocation of the remaining 20% which each argues should be assigned to separate factors, both of which the Appraiser and the Court have rejected. The Appraiser, in effect, divided the 20% equally between the two components he used.

In my own view, a more precise division of that 20% should be made by applying to it a factor derived from the allocations about which the parties agree. I think this is particularly desirable because both sides agree that earnings are entitled to seven times as much weight as assets. Applying such factors (7/8 for earnings, 1/8 for assets) to the remaining 20%, I conclude that the earnings percentage should be increased by 17.5%, while the asset percentage should be increased by 2.5%.

\* \* \*

I conclude that the value of a share of Universal stock on the date of merger should be determined to be as follows:

| Value Factor | Value | Weight | Result |
|---|---|---|---|
| Earnings | $92.89 | 87.5% | $81.28 |
| Assets | 91.72 | 12.5% | 11.47 |
| | | Value per share | $92.75 |