**UNIVERSAL CITY STUDIOS, INC., Defendant Below-Appellant and Cross-Appellee,**

v.

**FRANCIS I. duPONT & CO., et al., Plaintiffs Below-Appellees and Cross-Appellants.**

Supreme Court of Delaware.

Argued Nov. 20, 1974.

Decided Jan. 20, 1975.

E. N. Carpenter, II, and R. Franklin Balotti, of Richards, Layton & Finger, Wilmington; Cyrus R. Vance, of Simpson, Thacher & Bartlett, New York City, for defendant below-appellant and cross-appellee.

Richard F. Corroon and Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington; Walter G. McNeill, of Brown, Wood, Fuller, Caldwell & Ivey, New York City, for plaintiffs below-appellees and cross-appellants.

Edward Maxwell, of Young, Conaway, Stargatt & Taylor, Wilmington, for Joseph Keane, one of plaintiffs below-appellees and cross-appellants.

Before McNEILLY, Justice, and O'HARA and WALSH, Judges.

McNEILLY, Justice:

This is an appeal from a decision rendered by the Court of Chancery[1] pertaining to the valuation of shares of stock held by dissenting stockholders of Universal Pictures Co. (Universal) at the time of its merger[2] with Universal City Studios, Inc. (defendant). Plaintiff stockholders perfected their right to an appraisal under 8 Del.C. § 262 after their rejection of a tendered offer of $75 per share by defendant. The Appraiser determined that on March 25, 1966, the date of the merger, the value per share of Universal stock was $91.47. In arriving at this figure, the Appraiser attributed a $92.89 value to earnings and an $85.82 value to assets and accorded these figures a weight of 80 per cent and 20 per cent respectively. Both parties filed exceptions in Chancery, and it was there held that the value of a share amounted to $92.-

---

1. Francis I. duPont & Co. v. Universal City Studios, Inc., Del.Ch., 312 A.2d 344 (1973).

2. A "short merger" under 8 Del.C. § 253.

75. The Court agreed with the Appraiser's use of asset value and earnings value as determinants of the stock's worth. Furthermore, the Court approved the $92.89 earning value factor, but gave it an 87.5 per cent weight. It placed a $91.72 value on assets and gave it the resultant 12.5 per cent weight.

Both parties have appealed. Universal City Studios, Inc. (appellant) assigns as error the earnings multiplier arrived at by the Appraiser and the Court of Chancery. Further, appellant contends that the Court below erred in the determination of the asset value of a share of Universal stock. The plaintiff shareholders (appellees and cross-appellants), on the other hand, would have this Court affirm the findings below with respect to the earnings multiplier and assets value, but modify the award of interest. We shall consider each question separately.

### I.

■■ The first issue is the proper value to be placed upon a corporation's earnings as one of the indicia of a share of stock's worth at the time of a merger. A corporation's earnings, along with the market value of its stock, asset value, dividend record, earning prospects and other factors reflecting on a corporation's financial stability and prospects for growth, are all relevant matters for inquiry in ascertaining the value of stock held by dissenting stockholders. A compilation of as many of these factors as are pertinent to a given case has been held mandatory in arriving at the intrinsic value of stock held by shareholders who wish to disassociate themselves with an impending merger. Tri Continental Corporation v. Battye, Del. Supr., 31 Del.Ch. 523, 74 A.2d 71 (1950). As part of the valuation process, the Appraiser and the Court below took the earnings of Universal over the past five years prior to the merger and averaged them to arrive at a $5.77 per share average. The five-year average is reasonable and supported by the established law of this State. In Re Olivetti Underwood Corp., Del.Ch., 246 A.2d 800 (1968) ; Sporborg v. City Specialty Stores, 35 Del.Ch. 560, 123 A.2d 121 (1956) ; Application of Delaware Racing, Del.Supr., 213 A.2d 203 (1965).

■■ It is well settled that in an appraisal proceeding under 8 Del.C. § 262, the shares must be valued on a going concern basis. Sporborg v. City Specialty Stores, 35 Del.Ch. 160, 123 A.2d 121, 123 (1956). This approach necessitates not only the Court's examination of historical earnings but also a perusal of the corporation's stability and future prospects as of the date of merger. The prospective financial condition of the subject corporation and the risk factor inherent in the corporation and the industry within which it operates are vital factors to be considered in arriving at a realistic present earnings value. These considerations are manifested in the valuation process through the choice of a capitalization factor, or multiplier. The multiplier will be low if the financial outlook for a corporation is poor, or high if prospects are encouraging. When the multiplier is computed with the past earnings record (in this case $5.77 per share), the resultant figure is deemed to best approximate the present earnings value of a share of stock. The multiplier adopted by the Appraiser and the Court below was 16.1 and that figure, as well as the means used to arrive at such number, are the primary issues upon which appellant bases its appeal.

■ The choice of a multiplier is a most difficult task and one which is often the subject of parties' exceptions, since its use leads to an approximation of value for which creditable arguments can always be made for increase or decrease. Professor Dewing states in his work, "The Financial Policy of Corporation" (5th Ed., 1953) :

"[T]he determination of this rate is at best a matter of guesswork, but guesswork supported by the evidence of prices at which business of various kinds are

being actually valued at any one time. This evidence from current experience with reference to the value of different enterprises can be called . . . from the valuation put upon them . . . by investors who are willing to buy their bonds and stocks. (at 292)

The multifarious evidence available to aid in a determination of a multiplier and the inherent difficulties in assigning weight to the relevant factors have led this Court to pronounce that " . . . the application of a multiplier to average earnings in order to capitalize them lies within the realm of judgment. . . . [for which] there is no hard and fast rule . . ." Application of Delaware Racing Assoc., Inc., Del.Supr., 213 A.2d 203, 213 (1965). The innate impreciseness of a chosen multiplier has necessitated the adoption of a liberal test for reviewing decisions in appraisal proceedings below. *Delaware Racing,* supra, makes clear that if error in law or fact was committed in the stockholder's action below, then a redetermination of the multiplier by the Court would be proper; but, absent such error, the appraiser's choice will be upheld. Further, the rule in this State is that a lower tribunal's choice of a multiplier will be upheld if it is "within the range of reason." Swanton v. State Guaranty Corp., Del.Ch., 215 A.2d 242, 246 (1965); Felder v. Anderson, Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278, 285 (1960).

The appellees assert that the 16.1 figure should be affirmed. The appellant contends that improper criteria were used by the Appraiser and the Court in determining the multiplier and that the figure is impermissably high. For this letter proposition, appellants cite Professor Dewing, whose works in the past have been accorded deferential treatment in Delaware. At page 388 of his work, "The Financial Policy of Corporations," (5th Ed. 1953) Professor Dewing states that a multiplier of 10 is the highest value that can be assigned to a business. We, however, do not find such a view to be persuasive, but instead concur with the findings of *Swanton,* supra, (where a multiplier of 14 was fixed), which recognized that Professor Dewing's capitalization chart was not the "be-all and end-all," and it did not "freeze the subject matter for all time," especially since "contemporary financial history" reveals a "need for flexibility." (at 246).[3]

Appellants contend that the Appraiser and the Chancellor looked solely to the price-earnings ratios of nine other motion picture companies on March 25, 1966, and averaged them together to arrive at a 16.1 multiplier.[4] We agree with the appellant insofar as the 16.1 figure is arrived at through precise mathematical calculations involving the price-earnings ratios of these nine other companies. We disagree however that this was the sole consideration, and we give credence to the words of the Chancellor when he expressly stated:

"Arguably, there is much to be said about the choice of any particular multiplier and the briefs cover it all. In the last analysis, I am not persuaded that the Court should reject the Appraiser's reasonable judgment in this matter. In accepting his choice, I note particularly the trend of Universal's earnings, the predictability of certain of its television income during the four years following merger (which I regard as an earning prospect to be considered under *Tri-Continental Corportaion*), that valuation on a going concern basis as of a single date (of the merger) is the object of the appraisal, and the norm, therefore, is to determine the multiplier as of that date; determination of the multiplier by reference to the average experience of other companies in comparable businesses is a reasonable formulation in this case.

---

3. The profound changes in interest rates, money supply and the wage-price spiral in the twenty years since Professor Dewing's pronouncement are self-evident.

4. Those companies were Columbia, MGM, Paramount, Republic, 20th Century Fox, United Artists, M.C.A., Walt Disney & Warner Bros.

The earnings value (16.1 × $5.77=$92.-89) determined by the Appraiser will be approved". (312 A.2d at 350)

The Chancellor included a table in the opinion which showed that in 1961, earnings per share were $3.32, and that the earnings steadily increased until in 1965, they were at $8.02 per share. The record shows that during these years, none of the companies except Disney could show a steady growth trend. Within the industry, there was pronounced volatility of earnings, with years of deficit and decline. Universal, on the other hand, was able to show a steady growth, even during the period of 1962 and 1963, when the industry was suffering greatly. As for the "predictability" of certain of its television income, the Chancellor was taking cognizance of the Appraiser's report, which specified that Universal was to receive "substantial future income" in the sum of over $48,000,000 as a result of the leasing of major portions of its film library to television networks. Such commitments were labeled "guaranteed" by the Appraiser, and he noted that they would result in net earnings from television of at least $16.63 per share over the following four years. Further income could be expected from renewal of television contracts as well as from release of future films and subsequent leases to television. The evidence presented was sufficient to warrant a departure from Dewing's capitalization chart. The steady upward trend in Universal's earnings and the vast amount of money guaranteed to inure to Universal are persuasive factors indicating future economic success and stability. This situation is analogous to *Swanton,* supra, because increased revenue from television contracts is guaranteed in future years and is not represented in present earnings. It is true that a corporation in the motion picture industry, such as Universal, is subject to the whims of public taste and the artistic talents of its employees. Fluctuation in earnings is indeed a trademark of the motion picture industry and Universal was as vulnerable to non-acceptance of its theatrical productions as any other company. However, as of the date of the merger, Universal had exhibited a better earnings picture than any other motion picture company and had, through its television contracts, provided a buffer which would tend to offset for several years any theatrical losses.[5] Therefore a relatively high multiplier was warranted.

There are other factors not alluded to in the opinion which support a high multiplier in this case. The years of 1964 and 1965 showed a marked resurgence for the motion picture industry after a long period of slumping profits due to competition from television. The stock market reflected the turnaround of the industry by rising from the stock price index of 49 in 1963 (the mean price of Columbia, MGM, 20th Century Fox, United Artists, Paramount, Warner Brothers) to a mean of about $64 per share figure in 1966. Further, on March 25, 1966, the Dow Jones and Standard and Poors Indices showed an average price to earnings ratio of approximately 17.3, 17.4. Universal's growth rate during the years 1961 through 1965 amounted to 142 per cent or a compound rate of 25 per cent a year. This record, showing no yearly volatility, was far superior to those other companies within the industry and was also superior to the rate of growth of the stocks listed in the Dow Jones and Standard and Poors Indices.

Appellant contends that the use of the average price earnings ratio of the nine other companies in the industry was improper in that those companies were not comparable and did not reflect the corporate managerial policies which were unique to Universal. Alternatively, it is contended that if companies within the industry

---

5. In 1964, the loss in net income from theatrical distribution would have amounted to $713,000 if it were not for the $1,370,000 in television residual values which reduced the theatrical amortization. In 1965, the loss would have amounted to $2,486,000 but for the $3,490,000 charged against this amount in the form of television residual values.

were to be used in arriving at a multiplier, only those companies which were financially and otherwise comparable should have been used. In addition, appellant contends it was error as a matter of law for the average industry price earnings ratio to have been computed on the basis of one day's market price. We disagree.

Universal was a subsidiary of MCA and its stock was predominantly owned by the parent corporation. There was such a low percentage of Universal stock available to the public that no reliable data existed upon which to project a market value. Since Universal had no market value, it had no price-earnings ratio and a multiplier was therefore needed which would reflect the amount of public confidence in Universal's future and would, when multiplied with earnings, give a dollar figure closely approximating the earnings value of a share of Universal stock. "Without a market price for reference the selection of an appropriate multiplier takes on added import as a key factor in determining value." David J. Greene & Co. v. Dunhill International, Inc., Del.Ch., 249 A.2d 427, 434 (1968).

■ There being no valid market price for Universal's stock, and therefore no valid price-earnings ratio, the Appraiser was without a fixed mathematical method whereby factors relating solely to Universal's own stability and growth potential could be given effect in the form of a multiplier. Therefore, the Appraiser referred to the industry price-earnings ratio on the date of the merger as a starting point in the fixing of a multiplier. The use of price-earnings ratios of comparable businesses on the date of merger as a factor in evaluating another company, and here as a vital first step in arriving at a multiplier, is reasonable and has support in Delaware case law. In Felder v. Anderson, Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278 (1960), a five-year industry average price-earnings ratio served as a starting point for arriving at a multiplier for a corporation involved in a merger. The five-year average

was adopted because the market was in a boom phase. Though the motion picture industry was in a period of rejuvenation at the time of Universal's merger, a look at the price-earnings ratios over the five-year period preceding the merger as compared with the 16.1 average on the date of merger, reveals figures not disproportionate. The 16.1 figure being representative of the industry's past record, we see no reason to depart from the holdings of Levin v. Midland-Ross Corporation, 41 Del.Ch. 276, 194 A.2d 50 (1963) and David J. Greene & Co. v. Dunhill International, Inc., Del.Ch., 249 A.2d 427 (1968), where the price-earnings ratios of comparable companies and of Standard & Poors' national stock averages were calculated as of the date of merger and were used as comparative measures to aid in the determination of a multiplier for the subject corporations. The determination of value as of the day of merger being the Court's endeavor, it is appropriate that the price-earnings ratios of comparable companies, serving as barometers of risk within the industry, be referred to solely on the day of merger in the absence of extraordinary deviation from the past price-earnings record.

■ As for the appellant's contention that error was committed below by the use of certain non-comparable companies in arriving at the 16.1 figure, we are not persuaded to reverse. The "imponderables of the valuation process" and the concomitant broad discretion traditionally granted to evaluators of corporate shares of stock, compel an acceptance of the method of determining a multiplier unless there is a clear abuse of discretion amounting to an error at law, i.e., such as the use of only one value factor at the expense of other factors. *Tri Continental,* supra. With regard to review of findings below, it was stated in *Delaware Racing,* supra:

> "When they are supported by the record and are the product of an orderly and logical deductive process, we, in the exercise of judicial restraint, accept them, even though independently we might

have reached opposite conclusions." 213 A.2d 203.

We accept the findings below that the companies used to initially provide a basis for a multiplier for Universal were in fact "comparable" to Universal. True, some of the companies were more diversified than Universal, and some produced more award winning movies than Universal. Nevertheless, all nine companies were heavily engaged in the production of distribution of motion pictures and were therefore subject to the same public moods and reactions that effected Universal. We note that, based on its past record and managerial plans for the future, Universal was in a position to suffer less than other companies from woes generally effecting the industry. We are not prepared to delineate one or more companies within the same industry as Universal, as being non-comparable, when influxes applicable to one are applicable to all, but register in varying degrees as measured by financial growth or depletion. See David J. Greene & Co. v. Dunhill International, Inc., Del.Ch., 249 A.2d 427, 433 (1968). In that case, the Court admonished the Appraiser below for including in a group of companies, for purposes of ascertaining a multiplier based on comparabilty, five companies that were productive in a related field, but not within the industry. Nevertheless, the use of the price-earnings ratios of three companies which competed with the company under evaluation, "to a limited degree," was not found to have unwarranted effects in the choice of a multiplier.

From the foregoing, and after applying the standard of review applicable to the selection of earnings multipliers, we conclude that the 16.1 figure reached below is within the range of reason.

## II.

As to the asset value of $91.72 arrived at below, we will affirm without need for further discussion, the value, the weight applied, and the reasoning adopted by the Chancellor.

We further find support for the Chancellor's analysis and findings regarding the lack of a reliable market value of Universal stock and the inability to here "reconstruct" such value as an additional indicium of value.

## III.

By Order of the Court following the conclusion of the valuation proceeding below, the Chancellor fixed a 5.23% per annum rate of interest on the ascertained $92.75 value per share figure. This prejudgment rate of interest was explained by a concurrently issued Letter Opinion which cited the "prudent-investor" approach as the basis for the award as opposed to allowing interest at the prime rate.

The stockholders contend that the law envisages in an appraisal proceeding, that interest be awarded on the basis of benefits received by the corporation through the use of plaintiff's invested money. In other words, the shareholders maintain that the corporation should be held responsible for the amount of interest that it would have to pay if it were to voluntarily apply to a bank for a loan. Therefore, they allege that error was committed when the Chancellor did not base his award of interest on the prime rate charged to a most attractive borrower such as Universal.

The stockholders' contention is without merit and we cannot independently find an abuse of discretion as to the award below. The rule was correctly relied on below that the purpose of interest is to fairly compensate plaintiffs for their inability to use the money during the period in question. Felder v. Anderson, Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278 (1960). Therefore it was proper to focus on what would have been the rate of interest at which a prudent investor could have invested money rather than in focusing on

how much it would have cost the corporation to borrow the money. The 5.23 per cent interest per annum awarded to plaintiff from March 25, 1966 to December 7, 1973 is approved, with post-judgment interest accruing at 6% thereafter.

Affirmed.