**Michael SUSMAN, Plaintiff,**

v.

**LINCOLN AMERICAN CORPORATION, et al., Defendants.**

**No. 73 C 1089.**

United States District Court, N.D. Illinois, E.D.

Jan. 9, 1984.

As Modified Feb. 8, 1984.

Thomas R. Meites and Mary Rose Strubbe, Meites & Frackman, A. Bradley Eben, Chicago, Ill., for plaintiff class.

Randall L. Mitchell and Philip Fertik, Adams, Fox, Marcus, Adelstein & Gerding, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW [*]

SHADUR, District Judge.

In 1973 Michael Susman ("Susman") brought this suit as a derivative action on behalf of Consumers National Corporation ("Consumers") and as a class action on behalf of Consumers' minority shareholders (the "Class," termed simply "plaintiffs" where there is no need to distinguish between the Class and Susman).[1] Susman asserted various violations of the Securities and Exchange Act of 1934 (the "Act") and of state law in connection with Consumers' 1973 "going private" merger into its majority shareholder Lincoln American Life Insurance Co. ("Lincoln Life"), a wholly-owned subsidiary of Lincoln American Company of New York ("Lincoln American"). Ten years of motions and appeals [2] narrowed the scope of the action considerably. Then this Court's bench trial earlier this year gave the Class—but not Susman individually [3]—its hearing on the two remaining claims:

1. Material misrepresentations in and omissions from Consumers' April 1973 proxy statement (the "1973 Proxy," Pl.Ex. 12) violated Act § 10(b) and Rule 10b–5 promulgated thereunder.

2. In controlling Consumers' transactions and disclosures in 1972 and 1973, defendants breached their fiduciary duties to Consumers' shareholders under Delaware law.

In accordance with Fed.R.Civ.P. 52(a) this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any the Conclusions

---

[*] This Court extends special thanks to DePaul University College of Law student Nancy deBruin, who provided valuable research assistance, most significantly in the section dealing with State Law Claims.

1. This Court's unpublished order of March 10, 1981 certified the following plaintiff class:

All persons, other than defendants and those in concert with defendants, who held shares of common stock of Consumers National Corporation on June 8, 1972 and continuously thereafter at least until their receipt of proxy materials mailed by Consumers National Corporation to its shareholders April 2, 1973.

2. Just the *published* opinions in this case (and they were only a part of the total work product) occupy a great deal of space on the shelves of law libraries. See *Susman v. Lincoln American Corp.*, 587 F.2d 866 (7th Cir.1978), *cert. denied*, 445 U.S. 942, 100 S.Ct. 1336, 63 L.Ed.2d 775 (1980); 561 F.2d 86 (7th Cir.1977); 550 F.Supp. 442 (N.D.Ill.1982); 517 F.Supp. 931 (N.D.Ill. 1981); 500 F.Supp. 748 (N.D.Ill.1980).

3. One of this Court's opinions (550 F.Supp. at 443–45) permitted the Class to proceed without Susman on the ground that defendants had artificially mooted Susman's claim by tendering to him the full amount he sought.

as stated reflect factual findings, they shall be deemed Findings.

## Findings of Fact

### Parties and Relevant Transactions

1. Until August 1, 1972 Consumers National Life Insurance Co. ("Consumers Life") was a small life insurance company based in Evansville, Indiana. It was a publicly-held corporation until February 1, 1972, when it became a wholly-owned subsidiary of Consumers in a transaction in which Consumers Life shareholders became shareholders of Consumers instead. On August 1, 1972 Consumers and Consumers Life headquarters were moved to Memphis, Tennessee, where both companies continued their existence until Consumers was merged into Lincoln Life April 30, 1973. That merger of Consumers into Lincoln Life is the subject of this litigation.

2. At all relevant times Lincoln Life was a Tennessee life insurance company based in Memphis. On April 1, 1969 Lincoln Life had become a wholly-owned subsidiary of Lincoln American Co. of Tennessee ("Lincoln Tennessee") in a transaction in which Lincoln Life shareholders became shareholders of Lincoln Tennessee. Based on an agreement tentatively reached in October 1971, Lincoln Tennessee merged with Coburn Corporation of America ("Coburn") on May 1, 1972 to become Lincoln American.

3. In early 1969 Consumers Life management had asked defendant Richard Keathley ("Keathley"), President of Lincoln Life, to cause Lincoln Life to serve as a "white knight" by taking a controlling stock position in Consumers Life.[4] Lincoln Life offered to purchase a substantial block but the proposed deal was not consummated. Then in 1970 Consumers Life had given D.P.C., Inc. ("DPC") the capacity to control Consumers Life so that control could be marketed to a suitable third party. DPC was owned by Richard Davoust ("Davoust"), chief executive officer of Consumers Life and later Consumers, but Consumers Life retained the right to approve transfer of DPC's Consumers stock and stock option rights to a third party. DPC owned 124,190 shares of Consumers Life and an option (expiring February 24, 1972) to purchase 200,000 authorized but unissued Consumers Life shares at $7 per share.[5] Based on 742,826 shares outstanding (after giving effect to the assumed exercise of the 200,000-share option), DPC therefore was capable of owning 43.6% of Consumers Life stock. On September 28, 1971 Lincoln Tennessee acquired an option from DPC, good through February 1, 1972 (the "DPC Option"), to acquire its position in Consumers Life at a cost to Lincoln Tennessee (including the $1.4 million needed to purchase the 200,000-share block at $7 per share) of $11.10 for each of the 324,190 Consumers Life shares. Rather than exercise the DPC Option on the even of its proposed merger with Coburn, Lincoln Tennessee assigned that Option to Coburn, which exercised it (subject to the approval of the Indiana Insurance Commissioner) January 31, 1972.

4. Coburn obtained the approval of the Indiana Insurance Commissioner, and on May 3, 1972 Lincoln American (as successor to Coburn) closed its purchase of 43.6% of Consumers (as successor to Consumers Life). Five days later Davoust resigned and was replaced by Keathley as President of both Consumers and Consumers Life. Lincoln American and its subsidiaries began acquiring Consumers' shares on the open market, and by June 8, 1972, the same month as the 1972 Consumers shareholders' meeting, Lincoln American effectively owned 50.2% of Consumers' shares. As announced in the June 1972 proxy state-

---

4. That "white knight" purchase would have helped to protect Consumers Life from acquisition by United Founders Insurance Co. of Oklahoma City, Oklahoma ("United Founders"). United Founders never acquired control of Consumers Life in any event. See *United Founders*

*Life Ins. Co. v. Consumers National Life Ins. Co.,* 447 F.2d 647 (7th Cir.1971).

5. See *United Founders,* 447 F.2d at 651–52 for a description of the DPC transaction and the settlement of the United Founders takeover attempt.

ment (the "1972 Proxy," Pl.Ex. 6), at the shareholders' meeting Lincoln American elected four members of its own board of directors to Consumers' new five-member board of directors [6]: individual defendants Irving Bernstein ("Bernstein"), who was Lincoln American's President, Consumers' Chairman and Consumers Life's Chairman and also became Consumers' President; Keathley, who was Lincoln Life's President and remained as Consumers Life's President; Seymour Rosenberg ("Rosenberg"); and Jack Wilder ("Wilder"), who was Lincoln American's Chairman. As the fifth member of the Consumers board, Lincoln American elected incumbent Consumers' and Consumers Life's director Robert Kelly ("Kelly"), also an individual defendant. Lincoln American elected an identical board to direct Consumers Life. Kelly meanwhile took a position as Vice President of Lincoln Life.

5. It is not seriously contested that from the time Lincoln Tennessee obtained the DPC Option, Lincoln Tennessee and its successors Coburn and Lincoln American possessed at least an abstract intent to merge Consumers Life and Lincoln Life.[7] Moreover on July 7, 1972 Lincoln Life obtained permission from Tennessee's Insurance Commissioner to buy Consumers' shares from Lincoln American (Pl.Ex. 28) subject to the condition that Keathley "plot a course of merger in the very near future." Lincoln American moved Consumers' administrative operations to Memphis and consolidated them with those of Lincoln Life on August 1, 1972, thus realizing substantial savings. Lincoln American and its subsidiaries continued to make open market purchases, so that by March 29, 1973 Lincoln American effectively owned 63.7% of Consumers' outstanding shares.

6. In the 1973 Proxy, Consumers' board of directors (elected by Lincoln American in June 1972) recommended for shareholders' adoption a merger agreement providing for a mandatory cash-out merger, with all minority shareholders to receive $8.50 per share and with Lincoln Life to be the surviving corporation. It announced a special April 27, 1973 Consumers shareholders' meeting to vote on the merger, and it further announced the intention of Lincoln Life and its subsidiaries to vote in favor of the merger. Because Lincoln American controlled 63.7% of the vote, more than was required by Delaware law and Consumers' Articles of Incorporation, no degree of opposition by the minority shareholders could have defeated the merger. In fact 38.7% of all minority shares were voted on the merger, and of those shares 86.7% were voted in favor of and 13.3% were voted against the merger.

7. Susman brought this suit on behalf of minority shareholders April 26, 1973, the day before the special shareholders' meeting, seeking damages and injunctive relief. None of the defendants was served until after the merger was consummated, and no motion for a preliminary injunction was ever made. Claims remaining for disposition at the time of trial require factual determinations of (a) the actual value of minority shares at the time of the merger, (b) the existence and extent of any misrepresentations or omissions in the 1973 Proxy and whether Susman relied upon them to his detriment and (c) whether defendants breached state law duties to the minority shareholders between their acquisition of control of Consumers and the consummation of the merger.

---

6. Until the 1972 Consumers shareholders' meeting, the boards of directors of Consumers and Consumers Life comprised nine members each.

7. Coburn represented to the Indiana Insurance Commissioner (Pl.Ex. 38 at 7):

It is anticipated that many of the functions of Consumers Life and Lincoln Life will be combined for a more economical and efficient operation and that eventually, Consumers Life

may be merged into Lincoln Life and the Company into Coburn.

In addition the minutes of the September 20, 1971 Lincoln Life Executive Committee meeting state:

It is planned that Consumers National would eventually be merged into Lincoln American Life, the wholly-owned subsidiary of Lincoln American Corporation.

*Value of Consumers Shares*

8. On March 19, 1969, shortly after Consumers Life had sought out Lincoln Life to act as a "white knight" (Finding 3), actuary John Frucella ("Frucella") had determined Consumers Life was worth about $6.8 million as of December 31, 1968, or $12.57 per share based on the 542,914 shares outstanding before exercise of the DPC Option. Frucella, then an actuary for American General Insurance Co. ("American General"), prepared the valuation ("1969 Frucella valuation") at the request of Andrew Delaney ("Delaney"), a director of Lincoln Tennessee who was also a Vice President of American General.[8] Frucella had been trained in valuation by Delaney, who in turn was widely regarded as an expert in life insurance valuation. Frucella's valuation had as its principal component his finding that Consumers Life's $150.6 million face value in outstanding ordinary (as opposed to group) life insurance policies were worth about $4.3 million as an asset of the company. That finding in turn was based on a 1967 gross premium valuation by the actuarial firm of Nelson & Warren, Inc. Frucella found (Pl.Ex. 4A) Nelson & Warren's valuation, although high, was realistic because "approximately 20 percent of the company's business was written at exceptionally high premium rates."

9. In 1971, when Lincoln Tennessee was negotiating the DPC Option (Finding 3), Delaney had told Keathley Consumers Life was worth $11 per share. After Lincoln Tennessee acquired the DPC Option, Delaney assured Coburn's top management (including Wilder and Bernstein) that was a fair price. In addition on January 6, 1972 Frucella sent Keathley a second valuation of Consumers Life ("1972 Frucella valuation"), this time reporting the company was worth about $6.8 million, or $12.50 per share based on 542,914 shares and $11.02 per share if an additional 200,000 shares were issued as contemplated by the DPC Option agreement. That second valuation was expressed as of December 31, 1970, by which time Consumers Life's insurance in force had dropped to $139 million face value. Frucella found Consumers Life's ordinary life insurance policies were worth about $4.4 million, this time basing his finding on the 1970 Nelson & Warren report and his own calculation of future profits discounted at 12% to present value.[9] Frucella stated his valuation was conservative for a number of reasons.[10] Based on the advice of Delaney and Frucella, Coburn accepted an assignment from Lincoln Tennessee of the DPC Option.

10. Because DPC controlled a substantial portion of Consumers Life's stock, Coburn's acquisition of the DPC Option required the approval of the Indiana Insurance Commissioner (Finding 4). At an April 1972 hearing by the Indiana Insurance Commissioner, Bernstein testified the terms of that acquisition were fair and reasonable to Consumers' shareholders (formerly Consumers Life's shareholders). On the basis of documents filed before the Indiana Insurance Commissioner and admissions in depositions by Bernstein (Dep. 59) and Wilder (Dep. 61–62), this Court cannot affirmatively find the defendants

---

**8.** American General owned about 25% of the stock of Lincoln Tennessee and (when that stock was converted into Lincoln American stock upon the merger of Lincoln Tennessee and Coburn) about 9% of the stock of Lincoln American.

**9.** Frucella also referred to a lower valuation resulting from the use of a 15% discount rate.

**10.** Those reasons were:

1. The valuation assumed Consumers Life's non-insurance assets were invested at 5.5%, while in fact it obtained a somewhat higher return and it could be expected to receive still higher returns in the future because of increases in the market rate of interest.

2. No value was assigned to group life insurance or health insurance (but the 1969 Frucella valuation assigned no value to health insurance and a value of only $51,000 to all Consumers Life's group life insurance in force).

3. No value was assigned to Consumers Life's licenses to do business in 20 states in which Lincoln Life could not. Those (Frucella said) are often valued at $10–$15,000 each, and California and Ohio licenses are difficult to obtain.

perceived the $11.10 figure as including any "control premium" that might destroy the relevance of that figure to the real value of Consumers stock. Nonetheless the market value of Consumers stock at the time was only $7.50, a figure that cannot be ignored in investigating the significance of the $11.10 price.[11]

11. Once Lincoln American acquired its control block of Consumers stock and began to acquire additional shares on the open market, accountant Julius Glassman ("Glassman"), Lincoln American's Treasurer, from time to time worked with the accounting consequences of the proposed Lincoln Life-Consumers merger. For instance, shortly after the DPC Option was exercised Glassman was calculating what portion of Consumers' acquisition would be carried as good will, and in making notes on a scratch pad at one point (Pl.Ex. 86(b)) wrote: "We will pay ... $8,000,000 For company." Similarly one page of Glassman's note pad written on October 26, 1972 (Pl.Ex. 86(c)) included the words "Cost ... 8000 [M]." Plaintiffs seek to use these nearly-illegible notations as evidence that at any point in the acquisition process the minority shares were equal in value to $8 million minus the cost of the shares acquired by Lincoln American to that date. This Court rejects the notion that kind of rough calculation by an accountant, necessarily based on speculation about what future events might bring and obviously intended to reflect a working hypothesis for accounting treatment rather than a defini-

tive valuation, has the probative force plaintiffs urge.

12. At trial plaintiffs called Milton Meigs ("Meigs"), financial analyst at the firm of Duff & Phelps, as an expert witness on the value of the Class' shares at the time of the merger. Defendants countered Meigs' testimony with that of William Buchanan ("Buchanan"), a Fellow of the Society of Actuaries. Both estimated the value of Consumers by predicting the amount of income it could produce and discounting that prospective income stream to its present value. As the table in the Appendix (the "Chart") indicates, Meigs testified Consumers was worth $10.16 per share at the time of the merger, while Buchanan testified it was worth $6.61 per share. Meigs based his entire analysis on Consumers' 1972 earnings, rejecting all prior years as non-representative because of pre-fiscal 1972 changes he viewed as fundamental.[12] After adjusting for certain extraordinary events in 1972 Meigs predicted Consumers would grow at 3% per year indefinitely and based his present value calculations on that prediction. By contrast Buchanan found one year too short a time period on which to base his calculations. Instead he used the average annual earnings of 4¼ years ending March 31, 1973, thereby including the first quarter of Consumers' fiscal 1973 as well as fiscal years 1969–72. Buchanan adjusted the 4¼ year earnings history by the same extraordinary factors Meigs considered, but he rejected Meigs' 3% growth prediction and based his present value calculations on the prediction Consumers' earnings would nei-

---

**11.** In real world terms the ability to acquire absolute control, or assured working control, of a corporation in a single block transaction almost invariably justifies payment of a higher price than the market attributes to individually traded shares. That fact does not necessarily control the answer to the question of the fair price due to the remaining shareholders in a squeeze-out. In this case plaintiffs will be given the benefit of that doubt (that is, it will be assumed if Coburn had made a deal to acquire the minority shares in April 1972, based on what it then believed about Consumers Life, it would have had to pay the same $11.10 figure). At least part of the $3.60 spread between the $11.10 purchase price and the $7.50 market can

be explained by Lincoln Tennessee's and Coburn's assumptions they could raise the value of Consumers by moving Consumers Life's administrative operations to Memphis and combining them with those of Lincoln Life. That "premium," representing the predicted increase in value of all Consumers stock, of course was possible only because Lincoln American acquired "control." Defendants have willingly considered the efficiencies resulting from moving Consumers Life's administrative operations in calculating the value of the Class' shares.

**12.** See Finding 16.

ther grow nor decline.[13] For Findings 13–19 it is useful to refer on a continuing basis to the Chart's tabular comparison of the two witnesses' valuations.

13. As the Chart reveals, there are only a few serious points of disagreement between Meigs and Buchanan. After meeting Buchanan more than halfway on the question of Consumers' 1972 adjusted earnings,[14] Meigs nonetheless found each share worth $3.50 more than Buchanan because of differences in methodology represented by the lines of the Chart containing its footnotes 2 and 3. Meigs' removal of investment earnings from his general present value calculations increased his conclusion as to Consumers' value by about $800,000, more than $1 per share. His use of a 3% annual growth rate instead of a flat earning stream increased his conclusion as to Consumers' value by about $1.4 million, almost $2 per share. Meanwhile Buchanan's use of 1969–73 average adjusted earnings, rather than 1972 adjusted earnings alone, reduced his conclusion as to Consumers' value by about $1.2 million, more than $1.50 per share.[15] Those substantial differences may be translated into two issues of fact:

(a) Should Consumers' investment earnings be separated from and capitalized independently of its life insurance premium earnings, as Meigs did and Buchanan did not?

(b) Whose view of Consumers' prospects is more accurate: Meigs' view that it would grow from its 1972 adjusted earnings at 3% annually in perpetuity, or Buchanan's view that it would return to its average adjusted earnings of the prior 4¼ years and remain at that level?

14. On the evidence the first issue must be and is resolved in defendants' favor. Buchanan testified (Tr. II 60–61) the company as a whole, not just its life insurance branch, creates an earnings stream. Thus he concluded (*id.* at 62–63) given the information available it is best to capitalize the entire earnings stream at a single rate. On the other hand Meigs testified (Tr. I 47–48) only that he in fact excluded the company's investment income on its capital and surplus; he did not defend that approach. Meigs assumed Consumers obtained about a 7% return on its investment capital.[16]

---

**13.** Both experts deducted 25% from earnings to reflect the effect of federal corporate income tax.

**14.** Notably, both experts agreed it was necessary to adjust 1972 earnings upward for two extraordinary events:

1. At Lincoln American's direction Consumers in 1972 engaged in a reinsurance transaction of the type insurance companies regularly enter into as a tax planning (tax deferral) matter. Because it was a one-time non-operating transaction, the effect of the reinsurance transaction had to be eliminated from the earnings base. See Findings 26 and 31(b).

2. During 1972 Consumers moved its administrative operations to Memphis and consolidated them with those of Lincoln Life. It began to realize resulting expense reductions in 1972, but further savings were expected in the future.

Ironically defendants' expert Buchanan testified those events warranted a $585,000 upward revision in Consumers' earnings, while plaintiffs' expert Meigs found they warranted only a $370,000 upward revision.

**15.** Both sides persist in arguing much less important differences between the testimony of Meigs and Buchanan. In light of this Court's

Findings no definitive disposition is necessary of the factual questions concerning the use of a perpetual vs. a 20-year income stream and the value of Consumers Life's state licenses. It may nonetheless be observed:

1. On the first issue, even if a "terminal value" had to be assumed for Consumers Life's income at the end of 20 years, that figure (on Buchanan's estimate of level earnings) discounted at 12% to present value would not raise Buchanan's $6.61 per share figure to the $8.50 paid the Class.

2. On the second issue, most if not all of Meigs' attribution of value to state licenses represents an impermissible double counting and speculative value, given the fact Consumers was already being valued as a going concern.

**16.** Meigs did not actually know how much Consumers made on its investment capital; he calculated its average invested capital and from there (Tr. I 47) worked backwards to "what the earnings on capital would be." He must have assumed about a 7.44% rate of return on investment assets because $160,000, his assumed investment earnings, is about that proportion of $2,149,000, the face value he assigned to invested assets.

Both sides agree small life insurance companies such as Consumers should be capitalized at a 12% rate. By capitalizing Consumers' life insurance business at 12% and its investment holdings at 7%, Meigs effectively capitalized Consumers as a whole at a rate well below 12%, thus subverting both sides' testimony as to the propriety of the 12% capitalization rate. It is especially inappropriate for Meigs thus to bifurcate Consumers to a premium-collecting company and an investment company, for his prediction of 3% growth assumes Consumers would have invested as much as possible in expansion of its own agency force rather than in low-risk investments. Obviously the same capital cannot be used for two different purposes.

15. On the more generalized issue of the nature of Consumers' growth prospects, the analysis is necessarily more complex, but once again defendants must and do ultimately prevail. True enough the evidence supports plaintiffs' contention Consumers was in a turning posture, but the question is *which way* it was turning. Consumers made a profit in 1972 after posting losses in both 1970 and 1971. However its insurance in force declined in *every* year (including 1972) for which evidence was provided,[17] as did its ordinary premium income.[18] Plaintiffs' Post-Trial Br. 59–60 n. 47 explains that alarming and continuing statistical fact "merely reflects

the fact that terminations still exceeded new business (albeit by a modest amount)." Thus plaintiffs assumed—without any factual support—that a slowing rate of decline can be extrapolated into a positive growth rate of indefinite duration.[19] This Court rejects that assumption.

16. Meigs defended his growth scenario by citing various changes in Consumers' position in 1971 and early 1972. Those changes are summarized in the text of Davoust's April 28, 1972 oral report to the board of directors (Pl.Ex. 46).[20] Plaintiffs' Post-Trial Br. 55 summarized Meigs' testimony:

> [Meigs] noted that in prior years, Consumers Life had been plagued by a difficult and debilitating litigation for control (the United Founders litigation), which was not settled until 1971. (Tr. I, 13.) He then noted that in 1971 new management, headed by a long time director Richard Davoust, assumed control of the company from Hornsby Mims, who had previously been the chief executive officer. (Tr. I, 253.) Mr. Meigs testified that on the basis of his examination of the results for 1971 and the first portion of 1972, he concluded that the Davoust management had reversed the momentum of the company. (Meigs, Tr. [I] 253, 13, 33.) He also found in his analysis of 1971 and 1972 that expenses appeared to

17. Plaintiffs accuse defendants of misrepresenting Consumers' insurance in force in 1972, contending they erroneously failed in their Ex. 90(d) to reverse a 1972 reinsurance agreement despite purporting to do so. Based on plaintiffs' Ex. 104(f) this Court finds Consumers' insurance in force in 1972 was about $135 million, still lower than in 1971.

18. Meigs countered (Tr. I 30, citing Pl.Ex. 104(c)) the total assets of Consumers Life increased throughout the time period in question, but surely changes in the income-producing capabilities of those assets are a better measure of growth potential than changes in the amount of assets. This Court credits Buchanan's testimony (Tr. II 86) that, after deducting from asset growth the portion paid in rather than earned, Consumers Life's asset growth rate was so low it may be considered to have been "dissipating equity rather than gaining any momentum."

19. As defendants' Post-Trial Br. 33 n. 4 says:

> A decline in the rate of decline might support the view that Consumers was approaching a plateau of stagnation; it is not, however, evidence of positive growth, just as a slowdown in the spread of a cancer is not evidence that the patient will soon recover from his illness and thereafter become stronger than ever before.

20. Plaintiffs' Post-Trial Br. 57–58 indicates Meigs referred to Consumers' 1972 Annual Report. Though that report is not in evidence, the text of Davoust's oral comments to the Consumers board (Pl.Ex. 46), containing references to all the same information, is. However the need to refer to Pl.Ex. 46 raises another problem: It appears from the minutes of the board meeting that report was never delivered. See Def.Ex. 93. Thus there may have been a failure of proof on this point that would have had to be resolved had plaintiffs prevailed on this issue.

be coming under control, the worst of the termination problem was behind the company, as was the United Founders litigation, and other old problems (such as writing off $150,000 of old agent balances in 1971) had been solved. (Meigs, Tr. [I] 31–34.)

But a reading of Davoust's statement on which Meigs' testimony is based does not support the conclusion Consumers was on the brink of an extended period of growth. On page 1 Davoust (whose principal business experience had been in the oil industry, not insurance) outlined a laundry list of woes Consumers faced in mid-1971 cutting to the heart of its continued existence.[21] Although maintaining a positive tone as a chief executive officer should, Davoust emphasized (Pl.Ex. 46 at 2) if Consumers could not defeat its problems by increasing sales "the company will stifle and die by the weight of its own overhead and loss of existing business through attrition." Davoust vowed (id. at 6) to "rebuild the agency force with higher quality agents who will produce better business and profits in the future," a plan abandoned upon Lincoln American's acquisition of a majority of Consumers shares.[22] Meigs' "supporting" evidence is thus questionable at best, a

weakness amplified by Meigs' own equivocation on the witness stand. In rebuttal Meigs testified only (Tr. II 240) "There is grounds for saying that yes, there was a potential to stabilize this business," and (id. at 241) the investment climate "would provide a basis for making some projection that assumed that the company, indeed could show a positive earnings growth." [23]

17. While Meigs' perpetual growth prediction is hard to swallow (and this Court does not buy it), it is of course also recognized that Buchanan is unlikely to have hit the mark precisely in predicting Consumers' earnings would have dropped to their $4\frac{1}{4}$ year average, then remained stable for 20 years. Understandably neither expert purported to opine with certainty. Both predictions sought to identify the average of a universe of potential possibilities. It is only remotely possible Consumers would have grown at 3% for a long time. In contrast Buchanan's no-growth prediction has greater appeal because it factored in the possibility—supported by the objective evidence—Consumers was a declining company. In reaching his $6.61 per share valuation, Buchanan testified (Tr. II 60) his analysis of Consumers found "no pattern of growth," but in his opinion future con-

21. Davoust stated as to the problems his management team had to surmount (or at least he would have stated if the report were delivered) (Pl.Ex. 46 at 1):

There were no management goals or objectives on a long or short term basis set for the Company. There was no operating plan or procedure for sales or servicing of existing business. Our sales were of a minimum nature, both in quality and quantity. Costs in the home office and the field, in relationship to these sales, were completely out of line and running well in excess of 400 per cent of dollar volume of new sales. Our lapse ratio was one of the highest in the industry, i.e. older business was running off the books faster than it was replaced by new sales. Conservation effort was poor to non-existent. Our billing procedures led to poor persistency and many of our internal control systems and procedures were from poor to absolutely non-functional. Morale in the home office and the field was extremely low, further contributing to the high cost of operations and low volume of sales. Severe personality conflicts had developed in the upper echelon of management. We did find on the positive side

that, while over-staffed, the home office had competent staff personnel, though most of them were frustrated since they were unable to perform meaningfully.

22. Plaintiffs no longer contend that abandonment was a breach of fiduciary duty. See Finding 28. It must be recognized such an argument was non-persuasive anyway. It rests on the premise Lincoln American, a majority owner that would by definition derive the principal benefit from anything that would promote Consumers' business success, would deliberately make a counterproductive business decision (presumably to lower the price it would later have to pay Consumers' minority shareholders). That notion is at war with common sense (exemplifying the bird-in-the-hand concept).

23. Meanwhile Meigs' direct testimony (Tr. I 39) undercuts the claim new business would have outstripped terminations in upcoming years:

[I]ndeed, the trend for '71 and '72 at least shows a saucer effect, if you will, a flattening out of the termination picture so it would be a relatively hopeful sign.

traction was more likely than growth. That opinion was a probable and persuasive one, given (a) Consumers' constantly shrinking pool of insurance in force and (b) the defeat of Lincoln Life's expectations as to the quality of Consumers' agency force (a fact learned after the merger, when a full investigation was possible). Buchanan's crosscheck calculations, based on industry averages, produced slightly higher valuations than his primary analysis because Consumers generally performed lower than average in the industry.[24]

18. Fair value calculations require the consideration of more data than can easily be assimilated by a single analyst, even a well-informed one. Instead the ideal tool in such a calculation would be one that employs all relevant information and channels it through the decision making processes of people most likely to have a stake in the outcome of the calculation. Of course such a tool exists: It is the market. On that score, according to defendants' expert Thomas Meakin ("Meakin"), insurance stock analyst with Shelby, Cullom, Davis & Co., the market sides with defendants on the fair value question. Together with Buchanan's actuarial analysis, Meakin's testimony establishes Lincoln American offered a fair price to minority shareholders in the merger. Meakin's analysis of National Quotation Service "pink sheets" revealed (Tr. II 16–18) Consumers Life and later Consumers stock was traded on most days during the 16-month period he examined, constituting an active market for the stock. Meakin found (id. at 21) about 90 percent of the transactions were for approximately $7.50 per share, well below the $8.50 offered by Lincoln American.

19. Plaintiffs' Post-Trial Br. 76 attacks Meakin's testimony only by claiming the misrepresentations discussed below constituted a "fraud on the market." Plaintiffs take a narrow view of what information enters the market, seemingly arguing the market incorporates no information unless it has been revealed formally to the shareholders in a proxy statement. Such a position would be difficult to accept even if it were supported by evidence, which it was not. Of the misrepresentations and omissions claimed by plaintiffs, nearly all concerned public information omitted from the 1973 Proxy but not withheld from the market as a whole.[25] Indeed the market transactions covered an extended period *preceding* the 1973 Proxy, a period during which the information (assertedly *later* misrepresented in and omitted from the 1973 Proxy) was available. After all, any "fraud on the market" perpetrated by the 1973 Proxy would have impacted market transactions only during April 1973. Meakin's testimony covered a period well before that month, a period during which the information was already before the public. Thus the market protected the interests of the minority shareholders. In fact the only distortion in the market supported by evidence was established by Meakin himself (Tr. II 25): Because Lincoln American bought 150,000 shares over the time period he analyzed, Lincoln American artificially maintained the price of the Class' shares above what it would otherwise have been.

20. None of the informal valuations of Consumers Life and Consumers stock described at Findings 8–11, either individually or collectively, is sufficiently probative to overcome the combined weight of the testimony of Buchanan and Meakin:

(a) Frucella's 1969 valuation was based on a 1967 study by Nelson & Warren, Inc., which in turn relied on a basic valuation factor ($28.50 per $1,000 face value of insurance in force) developed in 1964. Although Frucella defended that factor, it was apparent from his treat-

---

**24.** Buchanan's cross checks produced values of $8.22, $7.33 and $6.63 per share, all below the $8.50 per share Lincoln American actually paid.

**25.** Findings 22–27 establish that all claimed misrepresentations and omissions involved public information, except (Finding 23) the failure to

disclose the 1972 Frucella valuation. Bernstein's estimates of the effect of the changeover to GAAP (Finding 26) were never made public, but the likely effects of the new GAAP accounting requirements were widely known to experts such as Bernstein.

ment of it he believed at the time it was quite a high figure. Buchanan persuasively testified (Tr. II 106) the valuation was too stale to be the basis of any sound actuarial judgment.

(b) Frucella's 1972 valuation also suffered from a staleness problem, though because it was based on 1970 data that problem was not as severe as it was for the 1969 Frucella valuation. In his deposition Frucella disavowed the accuracy of his 1972 valuation, for instance (Dep. 85–86) saying he should have used a higher discount rate and (Dep. 97) calling both valuations "very crude." Even considering the problem of Frucella's credibility (he probably perceived his interest at the time of his deposition as being aligned with that of the defendants), what appears to have been happening in 1972 was that Frucella sought to place a stamp of approval on the upcoming purchase of Consumers stock in order to "sell" it to Coburn.

(c) Of course the DPC Option price of $11.10 is probative, for it reflects an arms-length transaction between Lincoln Tennessee and DPC. Yet the price was $3.60 over market. Even assuming there was no control premium (Finding 10; but see n. 11), the only explanation for the disparity between the option price and the $8.50 figure is that the $11.10 price was too high. This Court so finds. This is not the first time a party has made a bad deal. Kelly testified (Tr. V 35) Davoust was a skillful negotiator and Keathley testified (Tr. III 9) the $11.10 offer was on a take-it-or-leave-it basis. Lincoln American made the deal without the kind of evaluation of what it was buying (largely intangibles) that prudence would have indicated. As a practical matter the necessary investigation would have jeopardized the value of the acquired assets if they were really there,

for the uncertainty would have produced likely defections in what Lincoln American thought was a good agency force. It took a calculated risk and went ahead. Once Lincoln American acquired control and investigated the quality of the agency force, home office staff and insurance in force, Keathley testified (*id.* at 61) he discovered Lincoln American had paid too much. It had.

(d) As already indicated (Finding 11), Glassman's notes have almost no probative value. There is no evidence (nor can it reasonably be inferred) Glassman's figures represent a valuation of Consumers at all, much less a careful and studied valuation. By the nature of mathematical calculations Glassman's analysis would not have differed greatly if he used different numbers. For the process in which he was engaged, Glassman needed only a working number to use as the projected cost of Consumers, and it would be wrong to let the major economic result in this action rest on the assumed accuracy of the number he used.

*Alleged Misrepresentations in the 1973 Proxy*

21. What the 1973 Proxy presented was a 25-page description of Consumers, Lincoln Life and the proposed merger. Two exhibits were attached: a copy of the merger agreement and a copy of Delaware General Corporation Law § 262, which sets forth appraisal rights for dissenting minority shareholders in mergers or consolidations. Plaintiffs argue the 1973 Proxy contained various material misrepresentations or omissions (see Findings 22–26), known to and intended by defendants, on which Susman and the Class relied to their detriment.[26]

22. 1973 Proxy at 1 said that because Lincoln American and its subsidiaries owned 64% of Consumers stock "the merg-

---

**26.** Plaintiffs also tendered proposed Findings of Fact that the disposition of about $1,400,000 cash received by Consumers in Lincoln American's purchase of the DPC block should have been described more specifically, but they never argued that was a material misstatement or

omission in any trial or post-trial brief. Consumers spent $900,000 on medium-term notes issued by Texas Consumer Finance Corporation ("TCF Notes") and lent about $500,000 to Lincoln American at market rates.

er may be considered a controlled transaction." 1973 Proxy at 2 stated the positions with Lincoln American and Lincoln Life held by each member of Consumers' board. Plaintiffs maintain those statements contained material omissions: the first because it did not say (as an earlier draft did) "the merger cannot be considered an independent, arms-length transaction," and the second because it did not say four of five Consumers' board members were members of Lincoln American's board *before* they joined Consumers. Plaintiffs' Post-Trial Br. 30 asks that a duty be imposed on defendants to have said the board members had an "overriding loyalty to LA/NY."

23. Plaintiffs claim material omissions in the failure to disclose the lack of a current independent valuation of Consumers and the existence and amount of the 1972 Frucella valuation. 1973 Proxy at 1 did state:

> The proposed exchange price of $8.50 in cash for each share of Consumers common stock is considered by the Board of Directors of both companies to be fair and equitable. In its assessment Lincoln Life's Board considered the present assets of Consumers, the scope of Consumers' business, the opportunity to expand Consumers' operations to other areas, and many other factors, including the market prices, book value per share, prospects, and effect of the merger on the income of Lincoln Life. Consumers' Board considered similar factors including the past history of Consumers, its

earning record and the market price of Consumers stock.

That statement is accurate as far as it goes. Whether the omissions are material is a legal question.

24. 1973 Proxy at 2 disclosed Lincoln American paid about $3.6 million total for DPC's 324,190 shares ($11.10 per share), then stated Lincoln American and its subsidiaries purchased about 150,000 shares on the open market at prices ranging from $7.25 to $9. Plaintiffs claim the 1973 Proxy's failure to say the $11.10 figure did not include a control premium was a material omission, and they contend the 1973 Proxy omitted material facts about Lincoln Life's open market acquisition of Consumers stock and misled Consumers shareholders about Lincoln Life's total investment in Consumers stock. In that respect plaintiffs charge the average price of $8.10 was omitted,[27] asserting at Post-Trial Br. 27 that omission is material because $8.10 is "only 5% less than the merger price." Plaintiffs also object to the statement (1973 Proxy 12) that Lincoln Life's investments as of December 31, 1972 included about $2.7 million "value in" Consumers stock, when in fact it had paid almost $4.9 million for that stock. Defendants retort that the $2.7 million figure was disclosed as the actual value of the stock pursuant to statutory accounting requirements then in force.[28] Plaintiffs argue the use of the $2.7 million figure was a misrepresentation, not because it was inconsistent with statutory accounting requirements[29] but

---

27. Plaintiffs' evidentiary basis for asserting an $8.10 average price is unclear. Their Revised Proposed Finding of Fact 95 does not cite to the record in support of that proposition. Meakin testified (Tr. II 21–22) about 90 percent of sales of Consumers stock during the time he studied were at a price near $7.50, and purchasers list their cost about $.15 higher than that to include brokers' commissions. Moreover a spot check of common stock purchases in Lincoln American's 1972 Annual Statement (Pl.Ex. 68(a) at 31–31A) reveals nearly all Consumers purchases in 1972 were at almost exactly $7.50. Yet defendants' own Post-Trial Br. 14 assumes the validity of the $8.10 figure.

28. Defendants' use of statutory accounting rather than generally accepted accounting principles

("GAAP") accounting is discussed below at Finding 25. But as for the particular item in dispute here, the $2.7 million figure was only a parenthetical explanation of part of Lincoln Life's $3.6 million in common stock investments. In light of the far more expansive and informative statement in 1973 Proxy at 2 (indicating Lincoln American had paid $4.7 to 4.95 million for the Consumers shares), plaintiffs' argument that the much later and more cryptic figure is misleading must be deemed near-frivolous.

29. Plaintiffs calculate Lincoln Life carried each Consumers share on its books as being worth only $5.78. They accuse Lincoln Life of using "an arbitrary year end figure of $5.78 per share" (Post-Trial Br. 28) but do not establish the use

instead because it further clouded the shareholders' perception of what Lincoln Life actually paid for its Consumers stock (but see n. 28). Yet even if all the matters referred to in this Finding 24 were resolved in plaintiffs' favor (a dubious proposition), they could not overcome the significance of the market's valuation of Consumers stock. All the items (except the fact Lincoln American did not perceive it paid a "control premium") were information made public in the Annual Statements of Consumers Life or Lincoln Life or both. And to the extent plaintiffs rely on documents submitted to the Indiana Insurance Commissioner in support of their claim the $11.10 price did not include a "control premium," that too was in the public domain and available to the market.[30]

25. In anticipation of SEC requirements that insurance companies state their 1973 financial statements in accordance with GAAP (instead of statutory accounting principles then in effect), 1973 Proxy at 23 stated:

> In February 1973, the American Institute of Certified Public Accountants issued an audit guide for stock life insurance companies establishing generally accepted accounting principles for stock life insurance companies which are required to be applied to 1973 reports. The Company has just commenced the work necessary to apply these principles which may have a material effect on the financial position and operations included in the consolidated financial statements.

In plaintiffs' view the statement the changeover "may have a material effect" was misleading because Bernstein, as well as perhaps Wilder, Keathley and Kelly,[31] had rough figures on hand indicating a substantial increase in book value of Consumers under GAAP from about $4 million to $6–6.5 million.[32] Plaintiffs argue at the very least defendants should not have used the word "may" in reference to the likelihood the GAAP changeover would have a material effect.

26. There was an error in the life insurance operations summary (1973 Proxy at 9, the "Table"), which provided basic financial data on Consumers Life for each year from 1968 to 1972. Throughout that period premium income, new business, terminations and insurance in force all showed a downward trend until 1972, when all four increased substantially. 1972 figures for premium income and new business were asterisked to a statement that large amounts ($249,198 in premium income and $17,994,666 in new business) in that year were attributable to a "modified co-insurance agreement." Under that agreement Consumers Life took over (or reinsured) a block of life insurance originally marketed by another company. In fact terminations and insurance in force were also increased by the reinsurance agreement, but there was no asterisked statement to that effect. Interestingly enough, the Table's failure to footnote the insurance in force to reflect the reinsurance figure obscured the fact that figure had also continued its consistently downward trend (this omission of course tends to negate any notion the omissions were intentionally slanted to put Consumers Life in a poor light). Nonetheless the Table created the erroneous impression new business exclusive of the reinsurance

---

of that figure was a violation of Lincoln Life's statutory accounting obligations.

**30.** In a footnote to the same section of their Post-Trial Brief, plaintiffs also argue the failure of 1973 Proxy at 2 to list the historic "asked" prices along with "bid" prices of Consumers and Consumers Life stock is a material omission. Because stock prices "asked" are somewhat higher than those "bid," omission of "asked" prices allegedly tended to reduce the apparent value of Consumers stock. Of course "asked" prices are published information and therefore available to the market.

**31.** Wilder, Keathley and Kelly did not recall ever hearing such preliminary GAAP figures. Bernstein testified at his Dep. 309 he probably relayed his estimates to them, but at trial (Tr. IV 120) he could not recall having done so.

**32.** See Bernstein Dep. 95–100. As it turned out book value rose from about $4.2 million ($5.63 per share) under statutory principles to about $6.7 million ($9.06 per share) under GAAP. Glassman Dep. 66.

agreement was up slightly from 1971 (from about $15.5 million to about $16.4 million) while loss of business was up substantially (from about $17.6 million to about $21.4 million). Actually the reinsurance had a relatively high lapse rate of 22 percent and accounted for about $4 million of terminations, more than the apparent increase in terminations from 1971 to 1972.[33] Plaintiffs also argue the failure to indicate there were no other reinsurance transactions in Consumers Life's history was a material omission.

27. In sum, most of plaintiffs' claimed deficiencies in the 1973 Proxy vanish on examination, and those that remain do not rise to the level of materiality in relation to the "total mix" of information (see Conclusions 3–10). Yet even if it were assumed some of the claimed misrepresentations or omissions were materially false or misleading, plaintiffs have totally failed to show Susman (or any other Class member) relied or would have relied on any of those matters to his detriment. Totally apart from the legal question discussed below whether he could have succeeded in state court even armed with additional facts, there is no proof whatever Susman acted or would have acted any differently because of the alleged misrepresentations. In fact plaintiffs' own evidence establishes precisely the opposite. Susman's original lawyer, his brother Arthur Susman, testified at trial to establish Susman did not know various facts claimed to have been omitted from or misstated in the 1973 Proxy. On cross examination, though, Arthur Susman specifically said any plaintiff who would have gone to Delaware state court in 1973 to enjoin a cash-out merger between a parent and its majority-owned subsidiary must have had "a death wish." Plaintiffs persist in speculating Susman might have sought an appraisal, convinced others to seek an appraisal, brought pressure to bear on defendants, obtained a state court damages verdict or sought to block the merger before the Indiana or Tennessee Insurance Commissioner. But they fail to recognize

reliance has a *factual* component. They made no affirmative showing whatsoever supporting, or reasonably establishing the likelihood of, Susman's reliance to his detriment.

28. Because Lincoln Life was assured of the success of the merger (given its pre-existing 63.7% ownership of Consumers stock) and because then-existing state law appeared to provide only an appraisal (and not an injunctive remedy) to dissident minority shareholders (see n. 46), Lincoln Life had no motive for lack of full disclosure in the 1973 Proxy. Plaintiffs have wholly failed to prove defendants had any intention to deceive, manipulate or defraud, and this Court affirmatively finds no such intention existed.

*Breach of Duty by the Consumers Board*

29. There were a number of alleged breaches of fiduciary duty under Delaware law, expressed in the Class' Proposed Findings of Fact and Conclusions of Law, that disappeared from plaintiffs' presentation of their case in post-trial arguments. That evaporation of issues was apparently a tactical decision by plaintiffs. Going into the trial it appeared to plaintiffs that unless they prevailed in contending breaches of fiduciary duty caused a decline in the value of Consumers stock, they could not prevail on the proposition that the claimed loss in value should be added back to the total value of Consumers. At trial however Buchanan testified for defendants, yet found Consumers' "augmented" earnings were even higher than those found by plaintiffs' expert Meigs. Buchanan reached such a high level of "augmented" earnings (see Finding 13) by reversing the challenged reinsurance transaction and by assuming Consumers' efficiency-promoting moves would put Consumers' operating expenses on a par with giants of the industry. Thus by Buchanan's testimony plaintiffs achieved what they had sought to prove by showing the Consumers board had breached its fiduciary duties. As a result plain-

---

**33.** It was possible to calculate the lapse rate on the reinsurance from data made public in Con-

sumers Life's 1972 Annual Statement. Compare Pl.Ex. 99(d) at 15 line 3 with *id.* at 43 line 3.

tiffs no longer assert (and they ignore defendants' lengthy treatment of) three propositions:

    (a) Consumers Life's loan to Lincoln American and its purchase of TCF Notes constituted impermissible self-dealing.[34]

    (b) Consumers' 1972 reinsurance transaction constituted impermissible self-dealing.[35]

    (c) Lincoln Life impermissibly diverted business from Consumers Life after acquiring control.[36]

If plaintiffs' failure to brief those issues were not enough to constitute their waiver, their later statement (Post-Trial R.Br. 8) that defendants' "claim that their efforts after assuming control increased Consumers' value ... support the class' argument" certainly is. In any case, though, plaintiffs' position on all those items is singularly unpersuasive.

  30. Plaintiffs still urge defendants violated their Delaware law duties of fairness and candor in connection with the merger. These findings have already discussed the fairness of the cash-out price and defendants' candor in the 1973 Proxy. In addition, the course of dealing between Lincoln American and Consumers was generally fair. It is true that the boards of Consumers and Lincoln American did not engage in give-and-take negotiations, but to the extent Lincoln American had acquired access to information material to the merger, Consumers directors also had access to that information. In its overall treatment the 1973 Proxy was complete and objective, and it contained financial statements prepared by independent parties.

### Conclusions of Law

■ 1. This Court has subject matter jurisdiction over plaintiffs' federal claims, for the merger involved the purchase or sale of a security within the meaning of the Act. Judge Aspen stated in *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1278, 1285 (N.D.Ill.1981):

    It appears to be settled that a minority shareholder forced to exchange shares in a corporation pursuant to a merger or going private transaction is a "seller" within the meaning of the securities laws.

Defendants point to plaintiffs' own claim that defendants intended all along to merge Lincoln Life and Consumers. On that premise, defendants say the acquisition of the minority shares was not an investment transaction but was merely the completion of the purchase of the entire business of Consumers. Though it has some surface attractiveness, that proposition fails:

    (a) Even if Lincoln American's initial motivation were that of an ultimate total acquisition, there is no room to find a "step transaction." Accordingly, once Lincoln American had acquired control of Consumers its "entrepreneurial" interest was fulfilled. Its acquisition at a later date of the remainder of the Consumers shares, at issue in this litigation, was only as an "investment." Thus Lincoln American's objective in purchasing the stock from plaintiffs brings *that* purchase within the Act as set forth in *Sutter v. Groen*, 687 F.2d 197, 203 (7th Cir.1982).

    (b) In any case the minority shares clearly constituted investment securities in *plaintiffs'* hands. That is sufficient according to the dictum in *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 467–68 n. 5 (7th Cir.1981), *cert. denied*, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981). True enough it would seem anomalous to find stock *was not* a security

---

**34.** See nn. 26 and 37.

**35.** See Finding 26. Defendants offered substantial justification for the reinsurance transaction. For one thing, it was a tax planning device resulting in Consumers not paying any income taxes in 1972. See n. 15.

**36.** Plaintiffs have also dropped their claims the 1972 Proxy should have disclosed (a) Lincoln American's plan to raid Consumers and then to merge it with Lincoln Life and (b) Lincoln American's $11.10 per share purchase price of the DPC block of shares. Plaintiffs never explained how defendants were responsible for the contents of the 1972 Proxy.

from the buyer's perspective (see *Sutter, Canfield v. Rapp & Son, Inc.*, 654 F.2d 459, 464–65 (7th Cir.1981) and *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir. 1981), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981)), yet *was* still a security from the sellers'. That issue has not been discussed in the cases to this Court's knowledge, but *McGrath* appears sufficient for current purposes.

This Court asserts its subject matter jurisdiction over the state law claims as pendent to the federal claims under the Act.

### Federal Law Claims

2. To prevail on their claims under Act § 10(b) and Rule 10b–5 plaintiffs must show (a) the 1973 Proxy contained material misrepresentations, omissions or deception, (b) defendants had "scienter" (that is, they intended to deceive, manipulate or defraud the Class), (c) the plaintiff (here Susman) relied on the material misrepresentations or omissions and (d) the misrepresentations or omissions caused injury to plaintiffs. See *Issen*, 508 F.Supp. at 1287 and cases cited. Each of those questions will be examined in turn.

### A. *Materiality*

■ 3. Most materiality cases, following the lead of *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), speak in the abstract of whether the correct information would alter the "total mix" of data such that "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." This is not a typical case, because mere changes in minority shareholders' voting decisions could not have made any difference in the outcome of the vote. Such finer points however are left to discussion under the reliance element. In terms of

materiality what is relevant is that the merger was one requiring shareholder approval. Thus the materiality issue is whether defendants had a duty to disclose the particular information in question to the shareholders, including of course the minority shareholders. That duty-to-disclose issue is applied to each of the claimed misrepresentations in the following Conclusions.[37]

#### 1. *"Controlled Transaction" (Finding 22)*

4. If the 1973 Proxy actually failed to reveal Consumers was being merged into its parent in a controlled transaction, that would undeniably be material. Here however the statements hardly "obscured" (Pl. Post-Trial Br. 30) the nature of the companies' relationship at all, much less in a material way. On the contrary, the change in language between the draft and the final statement merely altered a negative statement ("not ... an independent, arms-length transaction") to an affirmative one ("a controlled transaction"). Thus the final statement was stylistically better and in fact more descriptive: It said what the merger was, not just what it was not. Meanwhile, the board members' pre-existing connection to Lincoln American could have been gleaned from the 1972 Proxy—a document all Class members received.[38] As to plaintiffs' claim that defendants' overriding loyalty to Lincoln American should have been disclosed, that position begs the question whether they were in fact disloyal to Consumers.

#### 2. *The 1972 Frucella Valuation and the Lack of an Independent Appraisal (Finding 23)*

■ 5. As Finding 20(b) determined, the 1972 Frucella valuation was outdated and result-oriented. That valuation falls squarely within the holding of *Panter v.*

---

**37.** As n. 26 reflects, plaintiffs' post-trial submissions dropped any argument about the 1973 Proxy's failure to disclose the final disposition of the $1.4 million Consumers received in the sale of the DPC Option. However, that disclosure was not material anyway. Consumers earned more interest than Consumers' overall

net yield on cash and invested assets and, if necessary, Consumers could have redeemed the TCF Notes or called back its cash from Lincoln American at any time (Tr. IV 39–40).

**38.** See the Class definition at n. 1.

*Marshall Field & Co.*, 646 F.2d 271, 293 (7th Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) that there is no duty to reveal "tentative estimates prepared for the enlightenment of management with no expectation that they be made public." Moreover, the omission of an express statement Consumers did not obtain an independent appraisal also has not been shown to be material. While plaintiffs have shown such appraisals are common, they have not shown the failure to obtain one was so remarkable that reasonable shareholders would assume one had been obtained if there were no express statement to the contrary. Indeed it would not do to impose today's merger practices (in which an independent appraisal is more frequently obtained) as essential ingredients of a transaction of a decade ago.

### 3. Lack of "Control Premium" (Finding 24)

■ 6. Plaintiffs urge a duty on defendants to disclose that the DPC Option price included no "control premium." Minority shareholders could infer from such a statement only that their stock was worth $11.10 per share—an inference this Court has already found would be erroneous. As Finding 20(c) determined, the cost of the DPC block was in excess of its value if it did not include a control premium. Moreover it is difficult to regard information as material if it would not even have changed the stock's market price.[39] In this case the cost of the DPC block was public information revealed at the Indiana Insurance Commissioner hearing (Finding 11), in Lincoln American's Annual Statement (Pl.Ex. 68(a) at 31A) and in the 1973 Proxy. Arguably defendants' perception that they had

not paid a control premium was also known to the market (see Finding 24). Thus the market rate incorporated whatever significance was implied by the fact Lincoln American paid $11.10 per share, yet the market still remained below the $8.50 cashout price. In view of (a) the unreliability of the DPC Option as a value figure and (b) the market's failure to react to the DPC sale by bringing up the value of Consumers stock, any failure to present the DPC Option price as a "valuation" by saying it did not include a control premium was not material.

### 4. Lincoln American's Cost of Market Purchases (Finding 24)

■ 7. No significance can be attached to the 1973 Proxy's statement of a $7.25 to $9 range of prices paid by Lincoln American for Consumers stock, rather than an average. First, such difference in expression was not material because the range was fairly representative of the $8.10 average price—that figure is almost exactly halfway between $7.25 and $9 (it is just 2½ cents *below* the average of those numbers). In fact disclosure of the range revealed (as the average alone would not) that some minority shareholders had received more than the merger price for their stock. Second, any failure to disclose Lincoln Life's historical cost of acquiring other shares would be material only to the extent relevant to current value, and (like informal appraisals) that cost may well be an inaccurate measure of the value. In any case the average price Lincoln American paid was publicly available from its Annual Statement and thus was incorporated in the market price.[40]

---

**39.** In fact the market is a remarkably efficient assimilator of all public (and some private) information. See Note, *The Efficient Capital Market Hypothesis, Economic Theory and the Regulation of the Securities Industry,* 29 Stan.L.Rev. 1031, 1034–57 (1977). Thus it has been argued materiality of information should be viewed as its capacity to affect market price. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities,* 38 Bus.Law. 1 (1982).

**40.** As for the claimed misrepresentation of the market price itself (see n. 30), omission of "asked" prices does not fit that description. No sale can take place at any price unless that price is "bid." Market price is significant because two persons having mutually antagonistic interests agree on each sale price. That cannot be said of prices merely "asked." See SEC Rel. No. 33–4936, 17 C.F.R. § 229.201(a)(iii) (1983). Besides, failure to disclose general market information is not material because it is publicly

### 5. *Disclosure of Lincoln Life's Consumers Stock Holdings at "Value" (Finding 24)*

8. Plaintiffs challenge the description of Lincoln Life as a company with $2.7 million of "value in" Consumers stock as a material misrepresentation because it made it difficult for Class members to tell what Lincoln Life actually paid for the stock. As n. 28 reflects, the $2.7 million figure (buried on page 12 of the 1973 Proxy in a description of Lincoln Life's business) was *not* a "misrepresentation." Any shareholder interested in determining what Lincoln American had paid for its Consumers shares would already have found on page 2 that Lincoln American paid $3.6 million for its first 324,190 shares, and $7.25 to $9 for each of its next 149,214 shares, for a total of somewhere between $4,681,000 and $4,943,000.

### 6. *Changeover to GAAP (Finding 25)*

9. Failure to disclose Bernstein's rough calculation of the probable results of a changeover to GAAP was also not a misrepresentation. Those figures were educated guesses (if that) at best, and there is no duty to disclose such guesses. *Freeman v. Decio*, 584 F.2d 186, 200 (7th Cir. 1978). Anyone who has drafted a proxy statement or practiced in this area of the law knows that *inclusion* of such unsupported preliminary guesstimates would be vulnerable to a charge of "materially misleading" (although this is of course not controlling in Rule 10b–5 terms, it would never get past SEC review). It should also be emphasized that GAAP changes affect book value, not *real* value. Findings 8–20 have already determined on all the evidence that Consumers was worth less than $8.50 per share at the time of the merger. Changing the numbers in a set of books in Memphis cannot create additional value in the company as a whole.[41] Studies show "accounting changes affecting the manner in which profitability is reported but not affecting real earnings do not cause investors to re-evaluate the prospects of the firm." Fischel, 38 Bus.Law. at 6 n. 19. As for the claim defendants should have stated the GAAP changeover "will" (not "may") have a material effect, defendants respond correctly that so vouching for the materiality of the GAAP conversion would have obliged them to do needless additional work (leading to expense and delay). Finally, because value cannot be created out of thin air it is not at all certain the GAAP changeover *did* have a material effect on Consumers' "financial position and operations."

### 7. *The Reinsurance Lapse Rate (Finding 26)*

10. This item is truly a detail relevant to a minority shareholder only if he or she intended to sit down with the 1973 Proxy and calculator in hand and conduct his or her own appraisal of Consumers.[42] That degree of specificity is not required of proxy statements. See *Cole v. Schenley Industries, Inc.*, 563 F.2d 35, 43 (2d Cir. 1977). Such a hypothetical researcher among the shareholders could have obtained a copy of Consumers Life's public

---

available. See *Valente v. Pepsico, Inc.*, 454 F.Supp. 1228, 1243 (D.Del.1978).

**41.** Four defense witnesses (Meakin, Tr. II, 25–26; Buchanan, Tr. II, 118; Keathley, Tr. III, 54; Bernstein, Tr. IV, 66) testified GAAP defers the cost of new business and therefore affects figures for shrinking companies like Consumers by reducing their earnings while increasing their book value. It is not clear however whether those predictions were borne out by the final figures. GAAP methods (Pl.Ex. 75) set Consumers' 1972 net income (exclusive of capital gains) at $380,417 less $177,566 "Provision for Federal Income Tax," or $202,851. Statutory methods (Pl.Ex. 99(d) at 4) set Consumers' 1972 net income (exclusive of capital gains) at $274,104 but deducted nothing for "Federal Income Taxes Incurred." One notable difference between the two methods was that in arriving at net income statutory accounting figures deducted about $1.2 million from gross income for increases in reserves while GAAP accounting deducted only about $700,000.

**42.** Looked at alone, the reinsurance lapse rate was not a matter of general concern because, as plaintiffs' witness Meigs testified (Tr. II 9), a 22% lapse rate on reinsurance of this nature should not have been cause for alarm to the defendants.

1972 Annual Statement. Plaintiffs' Post-Trial Br. 22 (footnote omitted) posits:

> This information, not provided in the proxy materials, would have painted a significantly different picture for the reasonable investor, indicating that Consumers had, indeed, "turned the corner."

Like so many of plaintiffs' assertions, that is manufactured from whole cloth. After all the reinsurance lapse rate had been publicly available, yet the market failed to conclude Consumers "had, indeed, 'turned the corner.'" As for the 1973 Proxy's asserted failure to indicate there were no other reinsurance transactions in Consumers Life's history, the Table conveyed the clear (and accurate) impression the 1972 reinsurance agreement was the only one during the several (and most recent, hence most relevant) years shown.

### B. *Scienter*

■ 11. Plaintiffs also strike out on the second necessary element of their claim under the Act: a showing of scienter. As Finding 28 and the numerous prior Findings that underpin it demonstrate conclusively, the requisite deceptive, manipulative or fraudulent intent (*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194–97, 96 S.Ct. 1375, 1381–1382–1383, 47 L.Ed.2d 668 (1976)) was totally lacking from defendants' complained-of conduct in this case.

### C. *Reliance*

■ 12. To establish the reliance element, a plaintiff must show he or she would have acted differently in some significant way if not for defendants' misstatements and omissions. Reliance is unique to each individual, so Susman himself must be shown to have relied on defendants' "fraud." [43] In a cash-out merger, reliance has a double aspect: Plaintiffs must show Susman would have acted somehow differently than he did if all facts were known, and that change in action must be relevant in light of the inevitability of the approval of the merger. Plaintiffs have proved neither element: [44]

(a) Ordinarily a plaintiff must come forth with evidence of reliance. However, where an omission rather than a misrepresentation is the basis of a Rule 10b–5 action, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) holds reliance can be inferred from materiality. But this is not an area for an irrebuttable presumption—like most inferences it is subject to rebuttal. Finding 27 not only has found an absence of evidence Susman would have acted or presented his case any differently if more facts were known, but also has found affirmatively to the contrary—based on the statement by Susman's own lawyer Arthur Susman that he would not have pursued an injunction in Delaware in 1973 unless he had "a death wish." That and the other components of Finding 27 squarely rebut the presumption of reliance.

(b) Even if a plaintiff would have acted differently in the absence of Rule 10b–5 violations he must also show he could have acted in a way that would affect the outcome of the merger. *Wright v. Heizer Corp.*, 560 F.2d 236, 249–51 (7th Cir.1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978), implies such a showing can be made by demonstrating in light of all the facts plaintiff has a valid cause of action

---

**43.** Because plaintiffs argue (see Finding 19) defendants committed a fraud on the market, they might have gone on to assert no individual reliance by Susman need have been shown (on the theory all investors relied to a degree on the accuracy of the market price). See *Rifkin v. Crow*, 574 F.2d 256, 263 (5th Cir.1978). Plaintiffs did not however develop any such argument.

**44.** Although reliance has thus not been shown, this Court does not rest its final decision on the issue, so there is no need to decertify the Class. Even so, it probably does not matter whether the Class loses on the merits or by decertification. At this late date it is highly remote that any Class member, freed of the binding effect of this lawsuit, would return to court to litigate the merits.

under state law.[45] As determined below at Conclusions 14–16, however, the Class has no Delaware law cause of action; thus this element of reliance is also absent.[46]

## D. *Causation*

■■■ 13. Plaintiffs have already sustained three strikes, though any one was enough to eliminate them from recovery on their federal claim. As the final clincher the element of causation of injury is also not present.[47] As Findings 8–20 establish, plaintiffs simply were not harmed by the 1973 Proxy because they received a fair price. In this area *Mills v. Electric Auto-Lite Co.*, 552 F.2d 1239, 1247–48 (7th Cir. 1977), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977) urges reliance on market figures rather than appraisals to avoid "substituting our abstract judgment for that of the market.... [S]uch a method would be economically unsound."

### State Law Claims

14. Both parties rely on *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983) to support their positions regarding plaintiffs' state law claims. *Weinberger, id.* at 703 requires the plaintiff in a suit challenging a cash-out merger to come forward first with allegations of fraud and some basis for invoking the majority shareholders' fairness obligation. Defendants then have two choices:

(a) They may show by a preponderance of the evidence the transaction was entirely fair to the minority shareholders.

(b) If a majority of the minority shareholders have approved the merger, defendants may show the majority completely disclosed all material facts regarding the transaction, thereby shifting the entire burden to the plaintiff to show the merger was unfair to the minority.

As to the second alternative, when *Weinberger* spoke of "an informed vote of a majority of the minority shareholders," it did not specify (nor did the earlier case it cited in that respect) whether it required an absolute majority of the minority shares outstanding, or only a majority of the shares voted. But this Court has current guidance on that Delaware law question— the decision in *Bershad v. Curtiss-Wright Corp.*, Civ. No. 5827 (Del.Ch. New Castle County Mar. 21, 1983), like this case a class action challenging a mandatory cash-out merger. There as here the controlling majority shareholder relied on (slip op. at 2, emphasis added) "a majority vote of all *voting* minority shares." Finding that merger structure "afford[ed] the minority stockholders a complete veto power" (*id.*) and "[t]he minority stockholder vote was an informed one" (*id.* at 14), Vice Chancel-

45. Plaintiffs' Post-Trial Br. 35 n. 28 urges plaintiffs should be required to make only a prima facie showing under state law, as suggested in *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Ins. Co.*, 606 F.2d 602, 614 (5th Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980), because reaching the merits under Delaware law would be "cumbersome and unnecessary." Here however the Delaware law claim is pendent and must be decided anyway. It would be bizarre to permit Rule 10b–5 recovery on the ground defendants had precluded access to a state law action, while this Court simultaneously resolves that very state law action in defendants' favor.

46. One question not discussed in Conclusions 14–16 that might bear on the presence of reliance is the likelihood of success in a Delaware state court back in 1973. On that score, this Court's own experience as a practitioner confirms Arthur Susman's testimony that Delaware

state courts accorded no prospect of enjoining a cash-out merger in 1973. See e.g., the strikingly similar case of *David J. Greene & Co. v. Schenley Industries, Inc.*, 281 A.2d 30 (Del.Ch.1971), demonstrating Susman could not have obtained a preliminary injunction in 1973 even with a complete set of facts regarding the merger. It was common lore in the securities bar that there was then no way for a minority shareholder to avoid the usual freeze-out merger, for (at least absent really gross unfairness) there was no shareholders' *right* to insist on continuity of ownership in the enterprise. *Singer v. Magnavox Co.*, 380 A.2d 969 (Del.1977) (since overtaken by *Weinberger*) came as a real stunner to knowledgeable securities practitioners.

47. Both parties speak of causation in terms of whether Susman actually relied on the statements, but the question falling *uniquely* into the causation element is plaintiffs' contention they received inadequate value for their shares.

lor Longobardi (citing *Weinberger*) shifted the burden of showing unfairness to the plaintiff. This case really does not turn on burdens of proof, for both parties have met their burden of production and the evidence is far from dead even. As the following Conclusions demonstrate, defendants prevail by either route—by assuming the burden of showing fairness or by proving the vote in their favor by the vast majority of the minority shares voted was an informed one.[48]

15. Under Delaware law defendants owed a fiduciary duty of fairness to the Class. Fairness comprises fair dealing and fair price, and fair dealing involves the duty of candor and the duty to conduct the cash-out merger in a way that protects the interests of minority shareholders. *Weinberger*, 457 A.2d at 710–11. Concededly the merger was completely unlike an arms-length transaction. There were no real negotiations. But unlike the *Weinberger* situation there were no appraisals kept secret from the Consumers board and there were no current appraisals showing more than the amount tendered could profitably be paid for each share. Here there was no violation of the duty of fair dealing for three reasons:

(a) Defendants fulfilled their duty of candor, which under Delaware law is very similar to the duty of disclosure under Rule 10b–5.[49] For example in *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del.1977) the Delaware Supreme Court defined the duty as one of disclosing "information such as a reasonable shareholder would consider important in deciding whether to sell or retain stock." Accordingly on the basis of the discussion in Conclusions 3–10 this Court concludes the disclosures in the

1973 Proxy were adequate and there was no breach of the duty of candor.

(b) There is no duty under Delaware law to have the subsidiary in a cash-out merger independently appraised before the merger. *Tanzer v. International General Industries, Inc.*, 402 A.2d 382, 391 (Del.Ch.1979).

(c) *Weinberger*, 457 A.2d at 711 pointed out "in a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger." This transaction was indeed non-fraudulent. And as to the issue of price, see Conclusion 16.

16. Defendants have also fulfilled their duty as to fair price. *Weinberger*, 457 A.2d at 713 requires "consideration of all relevant factors involving the value of a company." In Findings 8–20 this Court has done just that and determined on all the evidence the price was fair. Notably the court in *Francis I. du Pont & Co. v. Universal City Studios, Inc.*, 312 A.2d 344, 346–49 (Del.Ch.1973), *aff'd*, 334 A.2d 216 (Del.1975) approved a valuation method much like that used by defendants' expert Buchanan. In *du Pont* the appraiser (like Buchanan) had averaged the company's earnings for the five years preceding the merger, then discounted that predicted earning stream to present value by adopting a multiplier. Shareholders there argued earnings before the most recent year should not be considered, but the court found (312 A.2d at 349) a heavy presumption in favor of averaging, and it stated earnings trends may affect the choice of discount rate but not the choice of base figure.[50] Meanwhile, *Gibbons v. Schenley Industries, Inc.*, 339 A.2d 460, 467, 474 (Del.Ch.1975) urged greater reliance on market value when there is an active mar-

---

**48.** Certain fiduciary duty claims have not been pursued despite their having survived pre-trial motions. See Finding 29.

**49.** It seems the only certain departure from federal law is the absence of a scienter (intent to deceive) requirement, although Delaware courts also emphasize the wide discretion of the trial judge to act in equity to find and remedy

breaches of the fiduciary duty of candor. See *Harman v. Masoneilan International, Inc.*, 442 A.2d 487, 499–500 & n. 25 (Del.1982).

**50.** There was no "reliable market" for the minority shareholders' stock. Thus the court (312 A.2d at 352) rejected market value as a measure of value.

ket for the tendered stock, thus approving the valuation method used by defendants' expert Meakin.[51]

\*     \*     \*

To be successful on either their federal or their state claim, plaintiffs had to prevail on a number of issues, failure on any one of which would be fatal to the claim. Instead plaintiffs have proved *none* of the elements of their causes of action. Accordingly the Clerk of this District Court is directed to enter judgment against plaintiffs and in favor of defendants on plaintiffs' Complaint. This action is dismissed with prejudice.

### APPENDIX

Consumers National Corporation
Income Stream Valuation [1]
(000 omitted, except for "Value per Share")

| | Expert Witnesses | |
| --- | --- | --- |
| | Meigs | Buchanan |
| 1972 Statutory Declared Earnings | $ 263 | $ 263 |
| Reversal of Reinsurance Transaction | + 175 | + 282 |
| Predicted Future Efficiencies | + 195 | + 303 |
| Deduction of Investment Income [2] | − 160 | |
| "Normalized" 1972 Earnings | $ 473 | $ 848 |
| "Normalized" 1972 Earnings | $ 473 | $ 848 |
| Adjustment for Other Years' Earnings [3] | | − 222 |
| Adjustment for Estimation Error | − 3 | |
| Final Income Stream Base Figure | $ 470 | $ 626 |
| Discount of Base Figure to Present Value at 12% [3] | $ 4,003 | $ 3,507 |
| Reinsertion of Investment Assets [2] | + 2,149 | |
| Assets of Parent Company | + 1,398 | + 1,401 |
| Total Present Value of Income Stream | $ 7,551 | $ 4,908 |
| Value per Share | $ 10.16 | $ 6.61 |

---

1. Both witnesses adjusted the 1972 statutory earnings figures. Meigs termed the resulting figure "normalized" earnings while Buchanan called it "augmented" earnings (this chart employs the former term). In turn that figure has been further adjusted to produce the income stream base figure, which is then discounted to present value.

51. Although plaintiffs do not raise the point in their *Post-Trial Brief,* defendants refute Meigs' point on redirect examination that minority shareholders should receive more than market value for their shares because the prospect of a mandatory cash-out merger artificially deflates

2. Instead of measuring the income-producing value of Consumers' investment assets, Meigs considered their face value. Thus to avoid double counting it was necessary to deduct from Consumers' total earnings that portion attributable to its investment assets rather than to its life insurance premiums. See Finding 14.

3. Meigs' and Buchanan's differing predictions about future years' earnings substantially affected both the base figure and their present value calculations. Findings 15–19 discuss at length the validity of those predictions.

the prices offered on the open market. Their *Post-Trial Br.* 57 n. 24 points out that even if such a tendency exists in the market, "the possibility that the investor may be forced to give up his investment for cash should … be reflected in the original market price."